875 F.2d 584
 57 USLW 2723, 13 Fed.R.Serv.3d 825,
10 U.S.P.Q.2d 1935
 LOUIS VUITTON S.A., Plaintiff-Appellant,
and
Gucci Shops, Inc., Plaintiff,
v.
Pun Yang LEE, also known as Jane Lee, and In Ka Lee, also
known as John Lee, doing business under the name
K-Econo Merchandise, Defendants-Appellees.
 No. 88-2835.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 7, 1989.
Decided May 16, 1989.
 
 J. Joseph Bainton, Robert P. Devlin, Catherine J. Crowley, Paul D. Young, Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City, John F. Flannery, David A. Crossman, Fitch, Even, Tabin & Flannery, Chicago, Ill., for plaintiff-appellant.
 Jeffrey S. Firestone, Strange & Firestone, Chicago, Ill., for defendants-appellees.
 Before POSNER, EASTERBROOK, and RIPPLE, Circuit Judges.
 POSNER, Circuit Judge.
 
 
 1
 Louis Vuitton S.A., the French manufacturer of swank luggage, handbags, and other merchandise, appeals the district court's refusal to award it any damages for the infringement of its registered trademark by the defendants, Mr. and Mrs. Lee. Korean immigrants, the Lees own a shop in Chicago that they call K-Econo Merchandise. The shop carries an eclectic, even ragtag, selection of merchandise ranging from gifts, toys, and electronic equipment to handbags and luggage. Mr. Lee speaks no English; Mrs. Lee speaks poor "shopkeepers' English." When the events giving rise to the suit occurred the Lees had been living in the United States for four years, had (it appears) been engaged in the retail trade for that entire time, and had been selling luggage and handbags from time to time since opening K-Econo eighteen months previously.
 
 
 2
 Concerned with the widespread sale of counterfeit Louis Vuitton goods in American cities, Vuitton's counsel engaged an investigator, Melvin Weinberg. On May 29, 1985, accompanied by an employee of Gucci (a coplaintiff, Gucci did not appeal), Weinberg visited K-Econo and bought a counterfeit Louis Vuitton camera case for $37.80--a fraction of the price of the genuine item--and paid for it with a Master charge credit card. The Gucci employee bought a counterfeit Gucci camera case.
 
 
 3
 Vuitton and Gucci filed this suit on June 18, seeking treble the Lees' profits from the sale of the counterfeit merchandise, a permanent injunction, and attorney's fees. See 15 U.S.C. Secs. 1116, 1117(a), (b). Two days later, executing an ex parte order that the district judge had issued under 15 U.S.C. Sec. 1116(d)(1)(A), the plaintiffs seized three articles of counterfeit Vuitton merchandise and three articles of counterfeit Gucci merchandise from the Lees' store. At her deposition Mrs. Lee stated through an interpreter that customers had told her before the raid (indeed, before she sold the counterfeit camera case to Weinberg) that her Vuitton and Gucci merchandise was counterfeit. And at the opening of the trial on February 24, 1986, the parties submitted to the court a written stipulation (copied from the final pretrial order) that "with at least constructive notice of plaintiffs' federal registration rights, defendants have knowingly and wilfully offered for sale, sold and distributed various types of luggage, handbags and accessories upon which are imprinted imitations and copies of plaintiffs' registered trademarks. Plaintiffs have never authorized or consented in any way to the use by defendants of their registered trademarks." Shortly before the trial the district judge had issued an uncontested permanent injunction to prevent the Lees from further infringing the plaintiffs' trademarks, and the final pretrial order listed only a single issue for trial: "The parties dispute the amount of income generated by defendants as a result of the sale of counterfeit Vuitton and Gucci merchandise." The order lists no witnesses to be called by the defendants, no exhibits to be presented by them at trial, no findings of fact or conclusions of law proposed by them.
 
 
 4
 At trial Weinberg testified that he had seen "approximately 40 Louis Vuitton counterfeit handbags and 35 Gucci counterfeit handbags." Although Mrs. Lee had not signed her deposition, the parties had in the final pretrial order stipulated to its admissibility at trial; it was duly admitted and excerpts from it read to the judge, including the admission that she had known that the merchandise was counterfeit before she sold it. Testifying live at the trial, the Lees claimed they had bought only six fake Vuitton and six fake Gucci items, all from the back of the van of an itinerant Korean peddler, and had not known till the raid that the items were counterfeit. At the end of the trial the judge asked counsel for both sides whether "the statute requires the intentional sale of counterfeit [items]." When they agreed it did, he intoned: "The Court finds for the defendants." He did not elaborate, nor did he ever enter findings of fact and conclusions of law, as required in a bench trial by Fed.R.Civ.P. 52(a).
 
 
 5
 The defendants appealed, and we vacated the district court's judgment and sent the case back to the judge for compliance with Rule 52. See 813 F.2d 133 (7th Cir.1987). The judge took his time; it was not until August 19, 1988--almost eighteen months after we vacated his original judgment and two and a half years after the bench trial had ended--that he entered findings of fact and conclusions of law. 692 F.Supp. 906 (N.D.Ill.1988). Prefacing his discussion with the comment that this was an "unfortunate case," id. at 907, the judge chose to credit Mrs. Lee's testimony at trial that she hadn't known before the raid that the items were counterfeit, rather than the contrary testimony (also admitted as evidence at the trial) in her deposition. The judge waved aside the stipulation that the Lees had knowingly and willfully sold counterfeit merchandise, remarking that maybe all the stipulation meant was that the Lees had knowingly sold the merchandise, as opposed to knowing it was counterfeit merchandise. Alternatively he deemed the final pretrial order, from which the stipulation had been drawn, to have been modified by the course of the trial because the plaintiffs had not objected to the Lees' testifying contrary to the stipulation. The judge disbelieved Weinberg's testimony and indeed opined that he had come perilously close to committing perjury. The way was now prepared for the judge's conclusion (692 F.Supp. at 911-12):
 
 
 6
 Having determined that defendants did not "intentionally us[e] a mark or designation, knowing such mark or designation [was] a counterfeit mark," Sec. 1117(b), this court has concluded that, for reasons of equity, it should deny plaintiffs monetary relief under Sec. 1117(a). Defendants, who speak little English, did not realize they were violating plaintiffs' rights until they were so informed in June, 1985; once they knew, they immediately agreed to terminate their misconduct. Furthermore, out of the hundreds of items at K-Econo, only eight were shown to be counterfeits of Gucci and Vuitton.
 
 
 7
 In short, nothing in this case suggests that defendants were actively engaged in palming off counterfeit products as a substantial part of their business. There simply was no need for this case to have gone to trial on the issue of monetary relief. The permanent injunction sufficed to apprise defendants of their wrongdoing and ensure that they would not violate plaintiffs' rights in the future. The trademark laws entitled plaintiffs to protect their merchandise, as they did and should, but this court need not, and will not, allow plaintiffs to use the laws as a sword, and their millions as a mace, to crush two small, unsophisticated and unwary immigrant merchants.
 
 
 8
 The master of sword and mace asks us to reverse and remand for a new trial on monetary relief before a different judge.
 
 
 9
 The district judge's handling of this case has left much to be desired. He had no justification for entering judgment for the defendants without complying with Rule 52(a). He also had no justification for interpreting the stipulation to mean only that the defendants had knowingly sold the merchandise in question. Selling is not an act that is done unconsciously, so a "knowing" sale must mean something more than a sale performed while the seller is awake. It is true that the statute (so far as pertinent here) is limited to the sale of counterfeit merchandise, as distinct from the private use of it, see S.Rep. No. 526, 98th Cong., 2d Sess. 11 (1982), and that the Lees apparently kept some of the Vuitton and Gucci counterfeits for their personal use, or at least never got around to selling them. But it would be one thing for the Lees to stipulate that they had sold some of the counterfeits without thereby conceding knowledge of their counterfeit status, and it was another to stipulate that they sold counterfeit merchandise "knowingly and wilfully"--the latter stipulation, which is the one they made, could mean only that they knew they were selling counterfeits. The reference in the stipulation to constructive notice (lawyerese for no notice) signifies only that although the Lees may not have known that Vuitton and Gucci owned registered trademarks, this fact is irrelevant because section 1117(b), while imposing stiff monetary penalties only for the knowing use of counterfeit registered marks, does not require that the defendant know they are registered. See Joint Statement on Trademark Counterfeiting Legislation, 130 Cong.Rec. H12076-77 (daily ed. Oct. 10, 1984).
 
 
 10
 The stipulation was part of the final pretrial order; and although a pretrial order can be modified, modification shall be "by a subsequent order" and "only to prevent manifest injustice." Fed.R.Civ.P. 16(e). No subsequent order was entered here, and anyway the condition for such an order--that it be necessary to prevent manifest injustice--was not satisfied. The stipulation was in conformity with Mrs. Lee's deposition, in which she admitted having known before the raid that the merchandise was counterfeit. Her counsel had agreed to the deposition's being admitted into evidence even though she hadn't signed it. Although the judge said Mrs. Lee hadn't signed it because she thought it contained mistakes, there is no evidence to support this conjecture beyond the fact that she changed her testimony at trial. We don't know whether she failed to sign her deposition because there really were mistakes in it, because her lawyer didn't give it to her to sign, because her English was so poor that she couldn't read it, or because she realized that it contained damaging admissions. The least plausible conjecture concerning her volte-face, as we shall see, is that the plaintiffs' translator had mistranslated Mrs. Lee. And it would be absurd to infer a mistake in a deposition from the fact that, at trial, the deponent changed her testimony. Depositions are used at trial to impeach testimony; testimony is not used at trial to impeach depositions. If Mrs. Lee's admission had been given effect, as we think it should have been, Vuitton's entitlement to damages under 15 U.S.C. Sec. 1117(b) would have been established. More on this point later.
 
 
 11
 The judge also had no justification for berating Vuitton for seeking monetary relief rather than resting content with an injunction. As Congress well knew in beefing up the legal sanctions for counterfeiting trademarks in 1984 (even to the extent of making trafficking in counterfeit trademarks a crime, see 18 U.S.C. Sec. 2320), and as is anyway obvious to even a casual consumer, the sale of counterfeit merchandise has become endemic--perhaps pandemic. See S.Rep. No. 526, supra, at 2-6. Most of the infringing sellers are small retailers, such as K-Econo. Obtaining an injunction against each and every one of them would be infeasible. Trademark owners cannot hire investigators to shop every retail store in the nation. And even if they could and did, and obtained injunctions against all present violators, this would not stop the counterfeiting. Other infringers would spring up, and would continue infringing until enjoined. To stop counterfeiting, a trademark owner must be able to invoke section 1117(b), the treble-damage (alternatively, at the plaintiff's option, treble-profit) provision that Congress added to the trademark law in 1984. Treble damages are a particularly suitable remedy in cases where surreptitious violations are possible, for in such cases simple damages (or profits) will underdeter; the violator will know that he won't be caught every time, and merely confiscating his profits in the cases in which he is caught will leave him with a net profit from infringement. From this we can see that the disparity in size between the typical owner of a trademark on fashionable goods and the typical seller of counterfeits of those trademarked goods is no reason to deny monetary relief to the former; for the smaller the violator, the less likely he is to be caught, and the more needful therefore is a heavy punishment if he is caught. The fact that "palming off counterfeit goods" is not "a substantial part of [the violator's] business" (692 F.Supp. at 912 (emphasis added)) is not, as the district judge believed, an extenuating circumstance.
 
 
 12
 Section 1117(b) is a severe statute. The trebling of the plaintiff's damages or the defendant's profits--whichever is greater--is mandatory (as is the award of the plaintiff's attorney's fees), subject only to the statute's exception for "extenuating circumstances," which as we shall see is extremely narrow. The other provision under which the plaintiffs sought monetary relief in this case, 15 U.S.C. Sec. 1117(a) (plain Sec. 1117 before the 1984 amendments), not only makes the trebling of damages or profits discretionary and the award of attorney's fees exceptional, but also makes the award of relief under it "subject to the principles of equity." It was on this ground that the district judge refused to award damages under 1117(a). But the principles of equity referred to in section 1117(a) do not in our view justify withholding all monetary relief from the victim of a trademark infringement merely because the infringement was innocent. As between the "innocent" infringer who seeks to get off scot-free, and the innocent infringed who has neither engaged in any inequitable conduct nor sought treble damages or treble profits (or indeed any part of the defendant's profits that is attributable to the defendant's superior efficiency rather than to the plaintiff's trademark), the stronger equity is with the innocent infringed. That clearly is the case here with regard to the untrebled component of the relief sought. So far as appears, Vuitton is seeking profits that are due entirely to its trademark, for the fakes that the Lees sold were of poor workmanship and probably were marketable only because of their fake Louis Vuitton trademark. And the district judge's scolding notwithstanding, Vuitton has not been guilty of any inequitable conduct. It is not inequitable to enforce one's legal rights, whereas the defendants were at best careless in purchasing brand-name merchandise from an itinerant peddler without inquiry as to source. There is no evidence that Vuitton or Gucci engaged in predatory discovery or otherwise abused the litigation process. In these circumstances a plaintiff is entitled at the very least either to simple damages or to the defendants' profits. "Equity" is not a roving commission to redistribute wealth from large companies to small ones. The Lanham Act was not written by Robin Hood.
 
 
 13
 In addition, this is one of those relatively rare cases in which we are left with a "definite and firm conviction," United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985), that the district judge erred in a finding of fact--the finding that Mrs. Lee had not known before the raid that she was selling counterfeit merchandise. The Lees had lived in the United States for four years, engaged in the retail trade, and by their own admission had been selling handbags, luggage, and related merchandise for eighteen months before Weinberg appeared. Although not a large business, K-Econo was not negligible. During the year prior to the trial, the Lees had deposited more than a quarter of a million dollars in K-Econo's bank account. They accepted major credit cards. They must have known something about the retail trade. Vuitton and Gucci are international status symbols known to everyone, whether or not proficient in the English language, who sells handbags and luggage, and to most people who buy them. It is inconceivable that Mrs. Lee had never heard of these firms, nor did she testify that she had never heard of them. She could hardly have thought she was buying the genuine article, for manufacturers of high-fashion leather goods do not distribute them to retail outlets through itinerant peddlers, do not line the goods with purple vinyl, and do not sell them at prices which permit the retailer to make money reselling them for $37.80.
 
 
 14
 Consistent with all this circumstantial evidence, Mrs. Lee had unequivocally admitted in her deposition that she had known they were fakes. The judge had no ground for rejecting the admission. Cf. Lovejoy Electronics, Inc. v. O'Berto, 873 F.2d 1001, 1005 (7th Cir. 1989). Although the plaintiffs' interpreter did the interpreting at the deposition, the defendants had their own interpreter present. "Mr. Park [the plaintiffs' interpreter] will interpret for you [Mrs. Lee]. If at any time you want to consult with your lawyer, Mr. Lawrence, just ask us, and you can go off and speak with them. You have brought your own interpreter, Mr. Han Wook Lee [no relation to the Lees], and the three of you can go off and discuss whatever you need to discuss." The Lees' interpreter never did raise any question about the accuracy of Park's interpretation. Nor did the Lees' counsel until the trial. Finally, while it is (barely) conceivable that the Lees were unaware that it is unlawful in this country to use counterfeit trademarks, they make no argument to this effect and immigrant status is not usually thought to include immunity from the laws of the United States.
 
 
 15
 A further point is that although section 1117(b) requires a showing that the defendant's violation involved "knowing such mark ... is counterfeit," it is enough for these purposes that the defendant failed to inquire further because he was afraid of what the inquiry would yield. Willful blindness is knowledge enough. See Joint Statement on Trademark Counterfeiting Legislation, supra, 130 Cong.Rec. at H12076-77 ("Of course, if the prosecution proves that the defendant was 'willfully blind' to the counterfeit nature of the mark, it will have met its burden of showing 'knowledge' "); cf. United States v. Josefik, 753 F.2d 585, 589 (7th Cir.1985); Bosco v. Serhant, 836 F.2d 271, 276 (7th Cir.1987). Knowing as she must have that Vuitton and Gucci are expensive brand-name goods unlikely to display (as these did) poor workmanship, to be lined with purple vinyl, and to be sold by itinerant peddlers at bargain-basement prices, Mrs. Lee was obligated at the very least to ask her supplier whether the items he was selling her were genuine Vuitton and Gucci merchandise or counterfeit.
 
 
 16
 Even if we are wrong in believing that the judge committed clear error in finding that the use of the marks was not a knowing use, the issue had been stipulated away in the pretrial order and the judge violated Rule 16(e) in refusing to abide by it.
 
 
 17
 It remains to decide whether we should uphold the district judge's finding regarding the number of infringing items that the Lees sold, and remand simply for a determination of the profits they made on each, a trebling of that sum, an award to the plaintiff of its reasonable attorney's fees, as expressly provided for in section 1117(b), and an award to the plaintiff of its costs. We needn't worry about the defense of extenuating circumstances to treble-damage or treble-profit liability under section 1117(b), because as an affirmative defense it must be pleaded or otherwise presented to the district court. It was not, and is therefore waived. It is in any event inapplicable, being intended for extreme cases--cases in which "the imposition of treble damages would mean that [the defendant] would be unable to support his or her family," Joint Statement on Trademark Counterfeiting Legislation, supra, 130 Cong.Rec. at H12083; see Fendi S.A.S. di Paola Fendi e Sorelle v. Cosmetic World, Ltd., 642 F.Supp. 1143, 1147 (S.D.N.Y.1986). The Lees do not argue that this is such a case.
 
 
 18
 Ordinarily the judge's decision to disbelieve Weinberg's testimony concerning the number of infringing items would be conclusive, and then Vuitton would indeed be entitled only to treble the Lees' profits on the three Vuitton fakes they say they sold, plus attorney's fees and costs. But we think the judge's handling of this proceeding has been so flawed that none of his findings should stand. Cf. Rogers v. Richmond, 365 U.S. 534, 547, 81 S.Ct. 735, 743, 5 L.Ed.2d 760 (1961) ("Historical facts 'found' in the perspective framed by an erroneous legal standard cannot plausibly be expected to furnish the basis for correct conclusions if and merely because a correct standard is later applied to them"). Vuitton has a right to have the veracity of its witnesses evaluated by a judge whose judgment has not been clouded by overreaction to the human dimensions of the litigation as he perceived them. For he forgot that while the Lees are human, so are the customers, employees, suppliers, and owners of Louis Vuitton. A corporation is not a thing; it is a network of relations among human beings.
 
 
 19
 We do not wish to prejudge the new trial that we are ordering. Although the parties and the district judge were not (so far as the record reveals) aware of the fact, Melvin Weinberg is a notorious figure, and conceivably the judge was correct that Weinberg came close to perjuring himself, although we can find no support for this hypothesis in the record. It is true that on cross-examination Weinberg was unable to describe the Lees' shop, but as he explained he was concentrating on the Louis Vuitton fakes that he observed there, and there is no suggestion that the shop itself is memorable.
 
 
 20
 Still, Weinberg has not been the Honest Abe of the federal courts. An ex-criminal turned informant who continued to commit felonies while in the government's employ, Weinberg played a key role in the government's "Abscam" investigation, where his talent for fraud, perjury, and other misconduct drew considerable comment. See, e.g., Final Report of the Select Comm. to Study Undercover Activities of Components of the Department of Justice, S.Rep. No. 682, 97th Cong., 2d Sess. 18-19, 106-07, 172 (1982); United States v. Jannotti, 501 F.Supp. 1182, 1193-95 (E.D.Pa.1980) ("career swindler," id. at 1193), rev'd, 673 F.2d 578 (3d Cir.1982) (en banc) (but with specific approval of district court's characterization of Weinberg, see id. at 581). One court remarked that "his credibility could not be undermined more than it already had been by his sporadic memory, criminal background, and dubious motives." United States v. Jenrette, 744 F.2d 817, 826 (D.C.Cir.1984). Another called him "dishonest and deceitful." United States v. Meyers, 692 F.2d 823, 846 (2d Cir.1982). After Abscam was over, Weinberg found a new career, as an undercover agent in the fight against trademark counterfeiters. In one case he used Abscamesque tactics to catch the counterfeiter. Yet apparently his testimony in that case was credible, see United States ex rel. Vuitton et Fils S.A. v. Karen Bags, Inc., 602 F.Supp. 1052 (S.D.N.Y.1985), aff'd, 780 F.2d 179 (2d Cir.1985), rev'd, 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987), and in his other trademark cases, as well, he has been found a credible witness. See Louis Vuitton S.A. v. Spencer Handbags Corp., 765 F.2d 966 (2d Cir.1985); Louis Vuitton, S.A. v. After Dark Boutique, 680 F.Supp. 1507 (N.D.Fla.1988); Louis Vuitton S.A. v. Downtown Luggage Center, 706 F.Supp. 839, 841 (S.D.Fla.1988). We await his next performance with interest.
 
 
 21
 The judgment is reversed, and the case remanded for a new trial on damages, consistent with this opinion.
 
 
 22
 REVERSED AND REMANDED, WITH DIRECTIONS.
 
 
 23
 RIPPLE, Circuit Judge, dissenting.
 
 
 24
 The proper functioning of our judicial system requires that we recognize consistently the appropriate relationship between our court and the district courts whose judgments we are required to review. If I had been the district judge, I might have reached, on this record, the conclusion reached by my brothers today. However, as an appellate judge, I cannot say that the district court committed reversible error when it determined that, despite the stipulation and the pretrial order, the wilfullness of the violation was tried by consent of the parties after the defendants had obtained new counsel. Luria Bros. & Co. v. Alliance Assur. Co., 780 F.2d 1082, 1089 (2d Cir.1986); Miller v. Safeco Title Ins. Co., 758 F.2d 364, 368 (9th Cir.1985). Nor am I willing to substitute my own judgment for that of the trial judge on crucial matters of credibility--especially where those credibility determinations are so explicitly detailed. See Anderson v. City of Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). Accordingly, I would affirm the judgment of the district court.