968 F.2d 1532
 61 USLW 2060, 23 U.S.P.Q.2d 1351
 The GEORGE BASCH CO., INC., Plaintiff-Appellee-Cross-Appellant,
v.
BLUE CORAL, INC., Simoniz Canada, Ltd., and Michael
Moshontz, Defendants-Appellants-Cross-Appellees.
 Nos. 1122, 1304, Dockets 91-9212, 91-9214.
 United States Court of Appeals,
Second Circuit.
 Argued April 22, 1992.
Decided June 30, 1992.
 
 Frank J. Colucci, New York City (Colucci & Umans), for plaintiff-appellee-cross-appellant.
 Louis A. Colombo, Cleveland, Ohio (R. Scott Keller, Michael K. Farrell, Baker & Hostetler; Walter, Conston, Alexander & Green, New York City, of counsel), for defendants-appellants-cross-appellees.
 Before: OAKES, Chief Judge, and KEARSE and WALKER, Circuit Judges.
 WALKER, Circuit Judge:
 
 
 1
 Along with several issues regarding the particulars of injunctive relief, this case presents the general question of whether, in an action for trade dress infringement, a plaintiff may recover a defendant's profits without establishing that the defendant engaged in deliberately deceptive conduct. The district court concluded that bad faith was not a necessary predicate for an accounting. We disagree. Accordingly, we hold that in order to justify an award of profits, a plaintiff must establish that the defendant engaged in willful deception.
 
 BACKGROUND
 
 2
 The George Basch Co., Inc., ("Basch") manufactures and distributes NEVR-DULL, a cotton wadding metal polish. NEVR-DULL is packaged in a five ounce cylindrical metal can, about 3- 1/2 inches high by 3- 1/2 inches in diameter, and navy blue in color. Along with a product description and directions, the product's name is printed on the can in white block lettering. On either side of the product's name there are two red and white icons that depict what the product may be used for: the radiator grill of a car, silverware, a brass lamp, and a motor boat on a trailer.
 
 
 3
 Appellants, Blue Coral, Inc., its subsidiary Simoniz Canada Ltd., and their mutual president, Michael Moshontz (hereafter collectively referred to as "Blue Coral") manufacture and distribute a line of automotive wheel cleaning and polishing products. In both the United States and Canada, Blue Coral markets these products under the trademark ESPREE. In 1987, Blue Coral approached Basch with respect to becoming Basch's exclusive NEVR-DULL distributor in Canada. By agreement of the parties, effective July 28, 1987, Blue Coral became NEVR-DULL's exclusive Canadian distributor. NEVR-DULL was not sold under the ESPREE mark, and its Canadian trade dress remained substantially the same as the United States' version, with the exception that the French language was employed on the front of the can.
 
 
 4
 In April 1988, Blue Coral asked Basch to produce a wadding metal polish for Blue Coral to market in the United States. Blue Coral intended to add the polish to its line of ESPREE products. The parties negotiated through August of that year, at which time they ended their talks unsuccessfully due to an impasse regarding price. Blue Coral ultimately contracted with another manufacturer of metal polish.
 
 
 5
 On July 25, 1988, Blue Coral introduced EVER BRITE--the new ESPREE wadding metal polish--into the United States market. EVER BRITE was packaged in the same size cylindrical metal can used by Basch to package NEVR-DULL. The base color of the EVER BRITE can was black. On its front appeared an angled silver grid-like background. Superimposed over the center of the grid, also on an angle, were large white block letters which read "EVER BRITE." Five different types of wheel faces were depicted in the upper right hand corner of the grid. To the right of the wheel faces appeared six red and white icons that represented silverware, chrome wheels, brassware, brass beds, copperware, and car bumpers and trim.
 
 
 6
 Relations between Basch and Blue Coral turned bleak. In March 1989, Basch terminated Blue Coral's Canadian distributorship. Approximately one year later, Blue Coral introduced EVER BRITE into the Canadian market. Blue Coral's Canadian trade dress was also substantially the same as its United States' version--merely substituting French print in some places on the can where English had been used, and placing a hyphen between EVER and BRITE where none had been before.
 
 
 7
 On March 7, 1989, Basch brought this action in the United States District Court for the Eastern District of New York, Hon. Jacob Mishler, Judge. In its complaint, Basch alleged trade dress infringement in violation of § 43(a) of the Lanham Act, see 15 U.S.C. § 1125(a), unfair competition under New York law, misappropriation of confidential business information, tortious interference with business relations, and violation of the New York General Business Law, §§ 349(h) and 368-d. Blue Coral moved for summary judgment on all claims. The district court granted summary judgment for Blue Coral on the § 349(h) New York General Business Law count, but denied summary judgment on Basch's other claims.
 
 
 8
 The action was tried to a jury in July 1991. The district court directed a verdict in favor of Blue Coral with respect to Basch's claim for misappropriation of confidential business information. The court also ruled that, as a matter of law, Basch was precluded from receiving damages on its trade dress infringement claim because it had failed to produce any evidence regarding actual consumer confusion or that Blue Coral acted with intent to deceive the public.
 
 
 9
 The district court concluded, however, that despite Basch's failure to introduce evidence on either of these points, Basch could recover Blue Coral's profits if it succeeded on its trade dress infringement claim. The case was submitted to the jury by special verdict. The jury exonerated Blue Coral on the tortious interference count, but found against it on Basch's trade dress infringement claim. Accordingly, it awarded Basch $200,000 in Blue Coral's profits, allegedly stemming from Blue Coral's wrongful use of its EVER BRITE trade dress.
 
 
 10
 Blue Coral timely moved for judgment n.o.v. In its motion, Blue Coral argued that: (1) Basch had failed to prove that its NEVR-DULL trade dress enjoyed secondary meaning; (2) since Basch had not shown actual consumer confusion, or deceptive conduct on Blue Coral's part, Basch could not recover any of Blue Coral's profits; (3) it was for the district judge sitting as a court in equity, and not the jury, to make an award of profits; and (4) in any event, the $200,000 award was grossly in excess of its actual profits.
 
 
 11
 The district court denied Blue Coral's motion, and entered its judgment which included the $200,000 jury award. The judgment also contained an injunction allowing Blue Coral to sell off its remaining inventory of infringing cans, but prohibiting any future use of the existing trade dress in the United States market. The district court also denied Basch's application for attorney fees. This appeal followed.
 
 DISCUSSION
 I. BLUE CORAL'S APPEAL
 
 12
 As amended and in relevant part, § 43(a) of the Lanham Act provides:
 
 
 13
 Any person who, or in connection with ... any container for goods, uses in commerce any word, term, name, symbol or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods ... by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
 
 
 14
 15 U.S.C. § 1125(a)(1).
 
 
 15
 This provision protects what is known as a product's "trade dress" or packaging, which " 'involves the total image of a product and may include features such as size, shape, color or color combinations, texture, [or] graphics.' " LeSportsac, Inc. v. K Mart Corp., 754 F.2d 71, 75 (2d Cir.1985) (quoting John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 980 (11th Cir.1983)). Under § 43(a), in order to establish a defendant's liability for infringing upon an inherently distinctive trade dress, a plaintiff now need only prove that the defendant's trade dress will likely mislead consumers as to the source of the goods. See Two Pesos, Inc. v. Taco Cabana, Inc., --- U.S. ----, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).
 
 
 16
 Both in its motion for judgment n.o.v. before the district court, and on appeal, Blue Coral argued that Basch did not prove that its NEVR-DULL trade dress had acquired secondary meaning. Prior to the Supreme Court's recent decision in Two Pesos, absent proof of secondary meaning Basch would have failed to establish a prima facie case of trade dress infringement. See Laureyssens v. Idea Group, Inc., 964 F.2d 131, 136 (2d Cir.1992); Coach Leatherware Co., Inc. v. AnnTaylor, Inc., 933 F.2d 162, 168 (2d Cir.1991); Thompson Medical Co., Inc. v. Pfizer Inc., 753 F.2d 208, 217 (2d Cir.1985). However, on appeal, we must apply the law as it exists as of the date of our decision. See United States v. Security Industrial Bank, 459 U.S. 70, 79, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982). Since the jury specifically found that the NEVR-DULL trade dress was inherently distinctive, under Two Pesos, Blue Coral's secondary meaning argument is now moot.
 
 
 17
 We are aware, though, that Blue Coral did not have the opportunity to address whether or not the jury's finding of inherent distinctiveness was legally supportable. In a different case, we might order reargument solely on this one point. However, since for reasons that follow we conclude that the jury had sufficient evidence from which it could have reasonably inferred that the NEVR-DULL trade dress enjoyed secondary meaning, reargument is unnecessary. In other words, whether the NEVR-DULL trade dress is inherently distinctive as the jury found or not, Basch established a prima facie case of Lanham Act liability against Blue Coral.
 
 A. Secondary Meaning
 
 18
 A product's trade dress has acquired "secondary meaning" when "the purchasing public has come to associate [its constituent] words, symbols, collocations of colors and designs, or other advertising materials ... with goods from a single source." RJR Foods, Inc. v. White Rock Corp., 603 F.2d 1058, 1059 (2d Cir.1979). The "second" in secondary meaning signifies the fact that, with time and market exposure, a particular trade dress may come "to identify not only the goods but the source of the goods." 20th Century Wear, Inc. v. Sanmark-Stardust, Inc., 815 F.2d 8, 10 (2d Cir.1987) (quoting Ralston Purina Co. v. Thomas J. Lipton, Inc., 341 F.Supp. 129, 133 (S.D.N.Y.1972)).
 
 
 19
 In ascertaining whether a trade dress has acquired such dual recognition, courts should consider such factors as: (i) plaintiff's advertising expenditures; (ii) consumer surveys linking the trade dress to a particular source; (iii) sales success; (iv) unsolicited media coverage; (v) attempts to plagiarize the trade dress; and (vi) the length and exclusivity of the use. See id. at 217; Coach Leatherware, 933 F.2d at 169. "[N]o 'single factor is determinative,' ... and every element need not be proved." Thompson Medical, 753 F.2d at 217. (citation omitted).
 
 
 20
 Blue Coral argues that Basch failed to satisfy the " 'rigorous evidentiary requirements,' " entailed in proving secondary meaning. 20th Century Wear, 815 F.2d at 10 (quoting Ralston Purina Co., 341 F.Supp. at 134). The district court rejected this contention, and denied Blue Coral's motion to set aside the jury's verdict insofar as it was grounded on Basch's failure to meet its evidentiary burden.
 
 
 21
 As we have stated in the past, judgment n.o.v. is reserved for those rare occasions when there is
 
 
 22
 "such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result o[f] sheer surmise and conjecture" or the evidence must be so overwhelming that reasonable and fair-minded persons could only have reached the opposite result.
 
 
 23
 Stubbs v. Dudley, 849 F.2d 83, 85 (2d Cir.1988) (citations omitted). At trial, Basch presented evidence regarding the establishment of secondary meaning. To begin with, the record reflects that Basch has been selling NEVR-DULL in its current trade dress since 1983. Thus, at the time Blue Coral introduced its own EVER BRITE packaging, Basch's had been in circulation for close to six years. Furthermore, the jury was told that between 1986 and 1990, NEVR-DULL sales totalled approximately $7 million. In that period of time, Basch expended approximately $75,000 in advertising--running ads in various trade journals and specialty magazines, distributing miniature samples of its product, as well as sweatshirts depicting the NEVR-DULL trade dress.
 
 
 24
 Upon review, we note that Basch did not muster a strong case in support of secondary meaning. However, we cannot foreclose the possibility that a reasonable and fair-minded jury could have concluded that secondary meaning had developed. Therefore, we affirm the district court's judgment that Basch sufficiently established the necessary elements to support the jury's finding of liability.
 
 B. Grounds for Awarding Profits
 
 25
 We turn now to the issue of whether the district court correctly authorized an award of Blue Coral's profits. Section 35(a) of the Lanham Act generally provides that a successful plaintiff under the act shall be entitled, "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) costs of the action." 15 U.S.C. § 1117(a). Clearly, the statute's invocation of equitable principles as guideposts in the assessment of monetary relief vests the district court with some degree of discretion in shaping that relief. See id., (both damage and profit awards may be assessed "according to the circumstances of the case"). Nevertheless, that discretion must operate within legally defined parameters.
 
 
 26
 For example, it is well settled that in order for a Lanham Act plaintiff to receive an award of damages the plaintiff must prove either " 'actual consumer confusion or deception resulting from the violation,' " Getty Petroleum Corp. v. Island Transportation Corp., 878 F.2d 650, 655 (2d Cir.1989) (quoting PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc., 818 F.2d 266, 271 (2d Cir.1987)), or that the defendant's actions were intentionally deceptive thus giving rise to a rebuttable presumption of consumer confusion. See Resource Developers, Inc. v. Statue of Liberty-Ellis Island Foundation, Inc., 926 F.2d 134, 140 (2d Cir.1991); PPX Enterprises, 818 F.2d at 273. Here, Basch failed to present any evidence regarding consumer confusion or intentional deception. Accordingly, prior to the jury's deliberation, the district court correctly decided that damages were not an available form of relief. Basch does not appeal from this ruling.
 
 
 27
 However, with respect to authorizing an award of Blue Coral's profits, the district judge concluded that § 35(a) affords a wider degree of equitable latitude. In denying its j.n.o.v. motion, the district court rejected Blue Coral's position that, absent a finding of defendant's willfully deceptive conduct, a court may not award profits. Rather, it relied upon contrary dictum in Louis Vuitton S.A. v. Lee, 875 F.2d 584, 588-89 (7th Cir.1989), in determining that a Lanham Act plaintiff may be entitled to the profits of an innocent infringer, i.e., one who inadvertently misappropriates the plaintiff's trade dress. To the extent that the cases are ambiguous as to whether deceptive conduct is a necessary basis for an accounting, we take this opportunity to clarify the law.
 
 
 28
 The rule in this circuit has been that an accounting for profits is normally available "only if the 'defendant is unjustly enriched, if the plaintiff sustained damages from the infringement, or if the accounting is necessary to deter a willful infringer from doing so again.' " Burndy Corp. v. Teledyne Industries, Inc., 748 F.2d 767, 772 (2d Cir.1984) (quoting W.E. Bassett Co. v. Revlon, Inc., 435 F.2d 656, 664 (2d Cir.1970)). Courts have interpreted the rule to describe three categorically distinct rationales. See e.g., Cuisinarts, Inc. v. Robot-Coupe Intern. Corp., 580 F.Supp. 634, 637 (S.D.N.Y.1984) ("These justifications are stated in the disjunctive. Any one will do.").
 
 
 29
 Thus, the fact that willfulness expressly defines the third rationale (deterrence) may suggest that the element of intentional misconduct is unnecessary in order to require an accounting based upon a theory of unjust enrichment or damages. However, the broad language contained in Burndy Corp. and W.E. Bassett Co. is in no way dispositive on this point. Indeed, a closer investigation into the law's historical development strongly supports our present conclusion that, under any theory, a finding of defendant's willful deceptiveness is a prerequisite for awarding profits.
 
 
 30
 Unjust Enrichment: The fact that an accounting may proceed on a theory of unjust enrichment is largely a result of legal institutional evolution. Prior to the fusion of law and equity under the Federal Rules of Civil Procedure, see Fed.R.Civ.P. 2, courts of law were the sole dispensary of damages, while the chancellor issued specific relief. However, in order to avoid piecemeal litigation, once a court of equity took jurisdiction over a case it would do complete justice--even if that entailed granting a monetary award. This resulted in the development of parallel remedial schemes.
 
 
 31
 Long ago, the Supreme Court explained the origin of profit awards in trademark infringement suits:
 
 
 32
 The infringer is required in equity to account for and yield up his gains to the true owner [of the mark], upon a principle analogous to that which charges a trustee with the profits acquired by the wrongful use of the property of the cestui que trust. Not that equity assumes jurisdiction upon the ground that a trust exists.... [T]he jurisdiction must be rested upon some other equitable ground--in ordinary cases, as in the present, the right to an injunction--but the court of equity, having acquired jurisdiction upon such a ground, retains it for the purpose of administering complete relief, rather than send the injured party to a court of law for his damages. And profits are then allowed as an equitable measure of compensation, on the theory of a trust ex maleficio.
 
 
 33
 Hamilton-Brown Shoe Co. v. Wolf Brothers & Co., 240 U.S. 251, 259, 36 S.Ct. 269, 272, 60 L.Ed. 629 (1916).
 
 
 34
 Thus, a defendant who is liable in a trademark or trade dress infringement action may be deemed to hold its profits in constructive trust for the injured plaintiff. However, this results only "when the defendant's sales 'were attributable to its infringing use' of the plaintiff's" mark, Burndy Corp., 748 F.2d at 772 (quoting W.E. Bassett Co., 435 F.2d at 664), and when the infringing use was at the plaintiff's expense. Id. at 773. In other words, a defendant becomes accountable for its profits when the plaintiff can show that, were it not for defendant's infringement, the defendant's sales would otherwise have gone to the plaintiff. Id. at 772.
 
 
 35
 At bottom, this is simply another way of formulating the element of consumer confusion required to justify a damage award under the Lanham Act. As such, it follows that a profits award, premised upon a theory of unjust enrichment, requires a showing of actual consumer confusion--or at least proof of deceptive intent so as to raise the rebuttable presumption of consumer confusion. See Resource Developers, 926 F.2d at 140; PPX Enterprises, 818 F.2d at 273.
 
 
 36
 Moreover, the doctrine of constructive trust has traditionally been invoked to defeat those gains accrued by wrongdoers as a result of fraud. See Latham v. Father Divine, 299 N.Y. 22, 26-27, 85 N.E.2d 168, 170 (1949) ("A constructive trust will be erected whenever necessary to satisfy the demands of justice.... [I]ts applicability is limited only by the inventiveness of men who find new ways to enrich themselves by grasping what should not belong to them."); Restatement of Restitution, § 160 cmt. d (1937); cf Robert Stigwood Group Ltd. v. O'Reilly, 530 F.2d 1096, 1100-1101 & n. 9 (2d Cir.), cert. denied, 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976) (recognizing that imposition of a constructive trust over defendant's profits may be an available remedy for willful copyright infringement).
 
 
 37
 The rationale underlying the Supreme Court's holding in Hamilton-Brown Shoe Co. reflects this purpose. There, the Court upheld a profits award for trademark infringement where the "imitation of complainant's mark was fraudulent, [and] the profits included in the decree [were] confined to such as accrued to the defendant through its persistence in the unlawful simulation...." 240 U.S. at 261, 36 S.Ct. at 273. Thus, it would seem that for the defendant's enrichment to be "unjust" in terms of warranting an accounting, it must be the fruit of willful deception. See El Greco Leather Products Co. v. Shoe World Inc., 726 F.Supp. 25, 29-30 (E.D.N.Y.1989).
 
 
 38
 Where Plaintiff Sustains Damages: Historically, an award of defendant's profits has also served as a rough proxy measure of plaintiff's damages. Champion Plug Co. v. Sanders, 331 U.S. 125, 131, 67 S.Ct. 1136, 1139, 91 L.Ed. 1386 (1947); Mishawaka Mfg. Co. v. S.S. Kresge Co., 316 U.S. 203, 206, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381 (1942); Hamilton-Brown Shoe Co., 240 U.S. at 261-62, 36 S.Ct. at 272-73; see also, Restatement (Third) of Unfair Competition § 37 cmt. b (Tent. Draft No. 3, 1991) ("Restatement"). Due to the inherent difficulty in isolating the causation behind diverted sales and injured reputation, damages from trademark or trade dress infringement are often hard to establish. Recognizing this, the Supreme Court has stated that, "[i]nfringement and damage having been found, the Act requires the trademark owner to prove only the sales of articles bearing the infringing mark." Mishawaka Mfg. Co., 316 U.S. at 206, 62 S.Ct. at 1024.
 
 
 39
 Under this rule, profits from defendant's proven sales are awarded to the plaintiff unless the defendant can show "that the infringement had no relationship" to those earnings. Id. This shifts the burden of proving economic injury off the innocent party, and places the hardship of disproving economic gain onto the infringer. Of course, this "does not stand for the proposition that an accounting will be ordered merely because there has been an infringement." Champion Plug Co., 331 U.S. at 131, 67 S.Ct. at 1139. Rather, in order to award profits there must first be "a basis for finding damage." Id.; Mishawaka Mfg. Co., 316 U.S. at 206, 62 S.Ct. at 1024. While a plaintiff who seeks the defendant's profits may be relieved of certain evidentiary requirements otherwise carried by those trying to prove damages, a plaintiff must nevertheless establish its general right to damages before defendant's profits are recoverable.
 
 
 40
 Thus, under the "damage" theory of profits, a plaintiff typically has been required to show consumer confusion resulting from the infringement. Cf. Perfect Fit Indus., Inc. v. Acme Quilting Co., 618 F.2d 950, 955 (2d Cir.), cert. denied, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982) (New York law of unfair competition); G.H. Mumm Champagne v. Eastern Wine Corp., 142 F.2d 499, 501 (2d Cir.), cert. denied, 323 U.S. 715, 65 S.Ct. 41, 89 L.Ed. 575 (1944) (L. Hand, J.). Whether a plaintiff also had to show willfully deceptive conduct on the part of the defendant is not so clear. While some courts "rejected good faith as a defense to an accounting for profits," Burger King Corp. v. Mason, 855 F.2d 779, 781 (11th Cir.1988) (citing Wolfe v. National Lead Co., 272 F.2d 867, 871 (9th Cir.1959), cert. denied, 362 U.S. 950, 80 S.Ct. 860, 4 L.Ed.2d 868 (1960)), others have concluded that a defendant's bad faith is the touchstone of accounting liability. Cf. Champion Plug Co., 331 U.S. at 131, 67 S.Ct. at 1139 (accounting was unavailable where "there ha[d] been no showing of fraud or palming off"); Carl Zeiss Stiftung v. Veb Carl Zeiss Jena, 433 F.2d 686, 706-08 (2d Cir.1970) (discussing monetary awards which are inclusive of both damages and profits).
 
 
 41
 Deterrence: Finally, we have held that a court may award a defendant's profits solely upon a finding that the defendant fraudulently used the plaintiff's mark. See Monsanto Chemical Co. v. Perfect Fit Mfg. Co., 349 F.2d 389, 396 (2d Cir.1965), cert. denied, 383 U.S. 942, 86 S.Ct. 1195, 1198, 16 L.Ed.2d 206 (1966). The rationale underlying this holding is not compensatory in nature, but rather seeks to protect the public at large. By awarding the profits of a bad faith infringer to the rightful owner of a mark, we promote the secondary effect of deterring public fraud regarding the source and quality of consumer goods and services. Id.; W.E. Bassett Co., 435 F.2d at 664.
 
 
 42
 * * *
 
 
 43
 Although these three theories address slightly different concerns, they do share common ground. In varying degrees, a finding of defendant's intentional deceptiveness has always been an important consideration in determining whether an accounting was an appropriate remedy. In view of this, the American Law Institute has recently concluded that a finding of willful infringement is the necessary catalyst for the disgorgement of ill-gotten profits. See Restatement, § 37(1)(a) ("One ... is liable for the net profits earned on profitable transactions resulting from [the infringement], if, but only if, the actor engaged in conduct with the intention of causing confusion or deception ...").
 
 
 44
 We agree with the position set forth in § 37 of the Restatement and therefore hold that, under § 35(a) of the Lanham Act, a plaintiff must prove that an infringer acted with willful deception before the infringer's profits are recoverable by way of an accounting. Along with the Restatement 's drafters, we believe that this requirement is necessary to avoid the conceivably draconian impact that a profits remedy might have in some cases. While damages directly measure the plaintiff's loss, defendant's profits measure the defendant's gain. Thus, an accounting may overcompensate for a plaintiff's actual injury and create a windfall judgment at the defendant's expense. See Restatement, § 37 at cmt. e. Of course, this is not to be confused with plaintiff's lost profits, which have been traditionally compensable as an element of plaintiff's damages.
 
 
 45
 So as to limit what may be an undue windfall to the plaintiff, and prevent the potentially inequitable treatment of an "innocent" or "good faith" infringer, most courts require proof of intentional misconduct before allowing a plaintiff to recover the defendant's profits. Id.; see also Alpo Petfoods, Inc. v. Ralston Purina Co., 913 F.2d 958, 968 (D.C.Cir.1990); Frish's Restaurants, Inc. v. Elby's Big Boy, 849 F.2d 1012, 1015 (6th Cir.1988); Schroeder v. Lotito, 747 F.2d 801, 802 (1st Cir.1984) (per curiam) (applying Rhode Island law). We underscore that in the absence of such a showing, a plaintiff is not foreclosed from receiving monetary relief. Upon proof of actual consumer confusion, a plaintiff may still obtain damages--which, in turn, may be inclusive of plaintiff's own lost profits. See Getty Petroleum Corp., 878 F.2d at 655.
 
 
 46
 Neither Burndy Corp. or W.E. Bassett Co. rejects the notion that willful deceptiveness is a necessary predicate for an award of defendant's profits. See El Greco Leather Products Co., 726 F.Supp. at 29. To the contrary, both cases reflect the centrality of this factor. For example, defendant's profits were denied in Burndy Corp. because the plaintiff failed to establish that its own sales were diverted as a result of the infringement and that the defendant acted willfully. This finding precluded both unjust enrichment and deterrence as available grounds for relief. See 748 F.2d at 773. On the other hand, an accounting was ordered in W.E. Bassett Co. solely because the defendant had "deliberately and fraudulently infringed Bassett's mark." 435 F.2d at 664. Finally, to the extent that these cases suggest that a defendant's profits are recoverable whenever a plaintiff may obtain damages, we conclude that the language of Burndy Corp. and W.E. Bassett Co. was simply imprecise on this point, and we reject such a reading. Cf. Carl Zeiss Stiftung, 433 F.2d at 706-08.
 
 
 47
 Having stated that a finding of willful deceptiveness is necessary in order to warrant an accounting for profits, we note that it may not be sufficient. See Springs Mills, Inc. v. Ultracashmere House, Ltd., 724 F.2d 352, 356 (2d Cir.1983) ("an accounting may be appropriate whenever an infringer's conduct is willful"). While under certain circumstances, the egregiousness of the fraud may, of its own, justify an accounting, see W.E. Bassett Co., 435 F.2d at 664, generally, there are other factors to be considered. Among these are such familiar concerns as: (1) the degree of certainty that the defendant benefited from the unlawful conduct; (2) availability and adequacy of other remedies; (3) the role of a particular defendant in effectuating the infringement; (4) plaintiff's laches; and (5) plaintiff's unclean hands. See generally Restatement, § 37(2) at cmt. f & cases cited in the reporter's notes. The district court's discretion lies in assessing the relative importance of these factors and determining whether, on the whole, the equities weigh in favor of an accounting. As the Lanham Act dictates, every award is "subject to equitable principles" and should be determined "according to the circumstances of the case." 15 U.S.C. § 1117.
 
 
 48
 In light of the foregoing legal analysis, the district court's error becomes apparent. To begin with, the district judge concluded that an accounting was warranted in order to prevent Blue Coral's unjust enrichment. However, as stated earlier, Basch produced no evidence to suggest that the infringement caused any sales diversion. As a result, there is nothing to suggest that Blue Coral's EVER BRITE sales were at Basch's expense. It follows that "an accounting based on unjust enrichment is precluded." Burndy Corp., 748 F.2d at 773.
 
 
 49
 Secondly, even if Basch had shown loss of sales, it still would not have been entitled to an accounting for profits under a theory of unjust enrichment--or any other theory. The jury made no finding to the effect that Blue Coral was a bad faith infringer. Indeed, one reason why the judge refused to let the jury assess damages was the fact that Basch failed to present any evidence regarding bad faith infringement. Nevertheless, Basch argues that the court's jury instruction on liability--which suggested that the jury consider whether Blue Coral intended "to benefit" from Basch's NEVR-DULL trade dress--taken in conjunction with the special verdict finding that Blue Coral "intended to imitate Basch's NEVR-DULL trade dress," results in a constructive finding that Blue Coral engaged in intentionally deceptive conduct. We disagree.
 
 
 50
 There is an "essential distinction ... between a deliberate attempt to deceive and a deliberate attempt to compete. Absent confusion, imitation of certain successful features in another's product is not unlawful and to that extent a 'free ride' is permitted." Norwich Pharmacal Co. v. Sterling Drug, Inc., 271 F.2d 569, 572 (2d Cir.1959) (citation omitted). Of course, even when a likelihood of confusion does arise, that does not inexorably lead to the conclusion that the defendant acted with deliberate deceit. Depending upon the circumstances, consumer confusion might as easily result from an innocent competitor who inadvertently crosses the line between a "free ride" and liability, as it could from a defendant's intentionally fraudulent conduct.
 
 
 51
 In this regard, we note that the jury specifically found that "the acts of [Blue Coral] in violation of Basch's rights [were not] done wantonly and maliciously and in reckless disregard of Basch's rights." This conclusion is buttressed by the fact this is not a case of a counterfeit trade dress from which a jury might infer that Blue Coral "intended to deceive the public concerning the origin of the goods." WSM, Inc. v. Tennessee Sales Co., 709 F.2d 1084, 1087 (6th Cir.1983). Thus, we find no merit in Basch's contention that the jury effectively concluded that Blue Coral acted with wrongful intent.
 
 
 52
 Accordingly, we reverse the district court's denial of Blue Coral's j.n.o.v. motion, insofar as it related to the availability of an accounting in this case, and we vacate the jury's profits award. Because we hold that an accounting was not available in this case, we need not reach the issue of whether it was appropriate for the jury to calculate profits.
 
 II. BASCH'S CROSS-APPEAL
 A. The District Court's Injunction
 
 53
 The district court's injunction restrained Blue Coral from using the present EVER BRITE trade dress in the United States, but authorized the defendant
 
 
 54
 to manufacture, sell and distribute metal polishing cleaners in the same shape and size containers as previously used in the infringing trade dress if the color of the can is either silver or red ... with leave granted to plaintiff for additional relief based upon a showing of actual confusion.
 
 
 55
 The court's order also permitted Blue Coral to continue using its present trade dress outside of the United States, and to sell off its remaining inventory of infringing cans.
 
 
 56
 In its cross-appeal, Basch argues that this relief was insufficient. Specifically, Basch contends that: (1) the substantive breadth of the injunction is too narrow--i.e., a can by any other color is likely to confuse; (2) Blue Coral's authorization to use the trade dress outside the United States was based upon the court's erroneous legal conclusion that it lacked extraterritorial jurisdiction; and (3) the court erred in allowing Blue Coral to sell off its remaining inventory without ordering the defendant to account for the profits obtained from those sales. We find no merit in any of these arguments.
 
 
 57
 It is axiomatic that the contours of an injunction are shaped by the sound discretion of the trial judge and, barring an abuse of that discretion, they will not be altered on appeal. Springs Mills, Inc., 724 F.2d at 355. Moreover, "a finding of likelihood of confusion in an infringement action does not automatically compel the issuance of an injunction...." Jim Beam Brands Co. v. Beamish & Crawford Ltd., 937 F.2d 729, 737 (2d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1169, 117 L.Ed.2d 415 (1992); see also Soltex Polymer Corp. v. Fortex Industries, Inc., 832 F.2d 1325, 1329-30 (2d Cir.1987). If the trial judge ultimately determines that injunctive relief is warranted, "the relief granted should be no broader than necessary to cure the effects of the harm caused." Soltex Polymer Corp., 832 F.2d at 1329.
 
 
 58
 The instant injunction is consistent with these principles. First, given the fact that the EVER BRITE trade dress is, at best, only moderately similar to the overall appearance of the NEVR-DULL can, we agree with the district court that there was no need for Blue Coral to make major aesthetic changes. Basch was unable to produce any evidence of actual consumer confusion between NEVR-DULL and EVER BRITE during the approximately three years that EVER BRITE used the infringing trade dress. This suggests to us that the likelihood of confusion created by Blue Coral was minimal, see Plus Products v. Plus Discount Foods, Inc., 722 F.2d 999, 1006 (2d Cir.1983), thereby requiring only minimal correction. The district court's assessment that a change of can color would supply the needed distinction between products seems reasonable. In any event, the district court granted Basch leave to apply for additional relief upon a future showing of actual confusion.
 
 
 59
 Second, there is absolutely no merit to Basch's argument that the district court refused to enjoin Blue Coral's use of the infringing trade dress in Canada because the court erroneously concluded that it lacked extraterritorial jurisdiction to do so. The district judge explicitly stated that "unless the plaintiff can show that it is somehow damaged by the sales of the Evr-Brite [sic] product in the cans ... I will not enjoin the sale of Evr-Brite [sic] in Canada." Thus, the court's decision was based upon the plaintiff's lack of injury--not its own lack of power. Cf. Playboy Enterprises v. Chuckleberry Pub., Inc., 511 F.Supp. 486, 495-96 (S.D.N.Y.1981), aff'd, 687 F.2d 563 (2d Cir.1982) (declining to enjoin foreign use of infringing mark where "[p]laintiff ha[d] not submitted evidence to determine whether consumers in other nations would also be confused").
 
 
 60
 Finally, we cannot fault the district court for allowing Blue Coral to liquidate its remaining inventory of infringing cans without requiring the defendant to account for the profits on those sales. Our approval stems largely from the fact that Basch never moved for a preliminary injunction to restrain Blue Coral's use of the trade dress in question. Actions speak louder than words, and motions speak loudest of all. Since Basch itself apparently concluded that the economic loss it was suffering, if any, did not warrant a remedy from the outset of this action, we cannot say that the district court abused its discretion in allowing Blue Coral to sell off its remaining cans and retain the profits. Cf. E.I. Du Pont de Nemours & Co. v. Yoshida Int'l, Inc., 393 F.Supp. 502, 528 (E.D.N.Y.1975) (in minimizing injury to good faith infringer, injunction may provide for a grace period before use of infringing mark is permanently restrained); Carling Brewing Co. v. L. Fatato, Inc., 305 F.Supp. 1070, 1071 (E.D.N.Y.1969) (use grace period incorporated into permanent injunction).
 
 B. Attorney Fees
 
 61
 The Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). The decision whether or not to award such fees also rests within the broad discretion of the district judge. Getty Petroleum Corp. v. Bartco Petroleum Corp., 858 F.2d 103, 114 (2d Cir.1988), cert. denied, 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989). Basch argues that the district judge abused his discretion in denying its application for reasonable attorney fees. We disagree. In view of the fact that there was no finding of bad faith infringement in this case, indeed the jury specifically found that Blue Coral's actions in fashioning its EVER BRITE trade dress were not egregious, we find no abuse of discretion here. Orient Express Trading Co., Ltd. v. Federated Dep't Stores, Inc., 842 F.2d 650, 655 (2d Cir.1988).
 
 CONCLUSION
 
 62
 Having reviewed the development of the relevant case law under §§ 43(a) and 35(a) of the Lanham Act, and having considered the underlying policies that the law seeks to implement, we conclude that before a defendant may be held to account for profits received in conjunction with a trade dress infringement, a plaintiff must first prove that the defendant acted with willful intent to deceive the public. Since the plaintiff in this case failed to establish this vital element, we partially reverse the district court's denial of Blue Coral's motion for judgment n.o.v., and vacate the jury award. We affirm the district court's grant of injunctive relief and denial of attorney fees.
 
 
 63
 Affirmed in part; reversed in part; and jury award vacated.
 
 KEARSE, Circuit Judge, dissenting in part:
 
 64
 I respectfully dissent from so much of the majority decision as reverses the monetary award to plaintiff George Basch Co. ("Basch") on account of the infringement by defendant Blue Coral, Inc. ("Blue Coral"), of the trade dress for Basch's product, NEVR-DULL. The district court, though finding that damages were unavailable because there was no proof of actual consumer confusion, determined that an award to Basch of Blue Coral's profits was appropriate because Blue Coral had been unjustly enriched by its infringement. The court had noted that if the question of profits was a matter to be decided by the court rather than the jury, the court would accept the jury's findings as advisory. See Fed.R.Civ.P. 39(c). Whether the final judgment reflects findings and conclusions by the court or a refusal to set aside the jury's verdict, I think the award of profits was a remedy permitted by law and was supported by the findings of a properly instructed jury.
 
 
 65
 The Lanham Act, 15 U.S.C. § 1051 et seq. (1988), provides, in pertinent part, that when the plaintiff has established a violation of § 1125(a), which prohibits, inter alia, trade practices that falsely indicate a product's origin, the plaintiff is generally entitled, "subject to the principles of equity, to recover (1) defendant's profits, [and] (2) any damages sustained by the plaintiff." 15 U.S.C. § 1117(a). The term "profits" is not coextensive with the term "damages," see, e.g., Monsanto Chemical Co. v. Perfect Fit Products Manufacturing Co., 349 F.2d 389 (2d Cir.1965) (affirming denial of damages, reversing denial of profits), cert. denied, 383 U.S. 942, 86 S.Ct. 1195, 1198, 16 L.Ed.2d 206 (1966), and even where the plaintiff has not proven any loss of its own sales, and hence has not proven damages, an award of profits may be justified as an equitable remedy where the defendant has been unjustly enriched by his infringement, see id. at 395; W.E. Bassett Co. v. Revlon, Inc., 435 F.2d 656, 664 (2d Cir.1970) ("An accounting should be granted if the defendant is unjustly enriched....").
 
 
 66
 In the present case, the evidence was that Blue Coral, having been the exclusive distributor of Basch's NEVR-DULL in Canada, asked Basch to produce a Blue Coral version of the product that Blue Coral could distribute in the United States under its own trademark. When negotiations failed to achieve agreement, Blue Coral set out to copy Basch's NEVR-DULL. (See, e.g., Plaintiff's Exhibit 34, a Blue Coral document dated March 28, 1988, entitled "LABORATORY MEMORANDUM NO. 19 [--] DUPLICATION OF NEVR-DULL," discussing "the feasibility of duplicating Nevr-Dull for manufacturing by Blue Coral.")
 
 
 67
 The jury was instructed, inter alia, that it could not find infringement of the NEVR-DULL trade dress simply on the basis that Blue Coral had intentionally copied it. Rather, it was told that if it found that Blue Coral had intentionally copied the NEVR-DULL trade dress, it could find infringement only if it also found a likelihood of confusion, which it might infer if it found "there was an intent to benefit from Basch's protectable right in its NEVR-DULL trade dress." The court also told the jury that the amount of monetary damages it could award for trade-dress infringement was "limited to what you find the defendant Blue Coral made as a result of the violation of Nevr-Dull trade dress." The court explained that the jury could properly award to Basch only the amount Blue Coral made that it would not be fair or equitable for Blue Coral to retain.
 
 
 68
 Having been thus instructed, the jury was asked the following questions and gave the following answers:
 
 
 69
 "Was Basch's trade dress for its NEVR-DULL product inherently distinctive? Yes."
 
 
 70
 "Did the trade dress for Basch's NEVR-DULL product acquire secondary meaning? Yes."
 
 
 71
 "Did defendants intend to imitate Basch's NEVR-DULL trade dress? Yes."
 
 
 72
 "Did defendants' use of its trade dress in marketing EVER BRITE create a likelihood of confusion among a substantial number of members of the consuming public as to the source of EVER BRITE, i.e., as to whether EVER BRITE was manufactured by the maker of NEVR-DULL? Yes."
 
 
 73
 "Did the violation of Basch's right(s) proximately cause damage to Basch? Yes."
 
 
 74
 The jury found that the "[p]rofits earned by Blue Coral due to trade dress infringement" totaled "$200,000."
 
 
 75
 These findings of Blue Coral's intentional copying of a distinctive trade dress that had acquired secondary meaning, thereby creating a likelihood of consumer confusion, in order to benefit from the breach of Basch's rights, and culminating in the unfair receipt by Blue Coral of $200,000 in profits due to the infringement, suffice, in my view, to support the conclusion that Blue Coral was unjustly enriched. I would affirm the district court's judgment that an award of profits was justified.