**Craig P. NADEL, Plaintiff—Appellant,**

v.

**Will ISAKSSON, Defendant—Appellee.**

Docket No. 02–7274.

United States Court of Appeals,
Second Circuit.

Argued: Dec. 10, 2002.

Decided: Feb. 24, 2003.

Martin B. Pavane (Catriona M. Collins, on the brief), Cohen, Pontani, Lieberman & Pavane, New York, NY, for appellant.

Jonathan C. Moore, Law Offices of Jonathan C. Moore, New York, NY, for appellee.

Before: NEWMAN, SACK, and
SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge.

Plaintiff-appellant Craig P. Nadel appeals from a judgment as a matter of law issued by the United States District Court for the Southern District of New York (Richard Owen, J.) that supplanted a jury's determination of a special interrogatory, and hence a jury's verdict, in his favor. The district court held that the Jumping Toy, a toy design licensed to a toy company by defendant-appellee Will Isaksson, is a "new" toy vis-a-vis an earlier toy and that as such, it is not within the scope of an oral agreement between the parties to share licensing royalties from the earlier toy. Because we hold that the jury's determination in a special interrogatory finding the Jumping Toy not to be a "new" toy is supported by sufficient evidence, we vacate the district court judgment and reinstate the jury's finding on the "new" toy issue.

We also conclude, however, that the jury charge did not permit the jury to decide other contract-related issues contested at trial by Isaksson, namely whether the agreement makes Nadel's entitlement to royalties contingent upon any particular performance by Nadel (such as Nadel successfully marketing the Jumping Toy) and, if these performance obligations are part of the agreement, whether Nadel fulfilled them. Because Isaksson may therefore still prevail on the ultimate issue of liability, we remand to the district court for further fact-finding limited to these unresolved issues.

### BACKGROUND

If we leave to one side the parties' apparent personal interest in adjudicating their inventorship dispute, which is irrelevant to the legal issues as they come to us

on appeal, this case presents a textbook dispute over the terms of an oral contract.

### 1. The Toys and the Agreements

Will Isaksson is a toy inventor. By 1994, he had built a prototype of a toy called the Dual Differential, a remote-controlled vehicle composed of a single two-wheeled axle and a short, rigid tail dragged from the axle's midpoint. A complicated "dual-differential" mechanism permitted a single motor to rotate each tire at an independent speed and thus made the toy highly maneuverable. Furthermore, when the spin of the wheels was suddenly reversed when the toy was moving straight, the toy would suddenly brake, inertia would "flip" the tail over the top of the axle, and the toy could immediately resume traveling in the opposite direction. The tail could flip sides and the toy could roll over in this manner because the toy had no distinct top or bottom. In an oral agreement, Isaksson and Dietmar Nagel of the firm Design O Matic, whose principals were Nagel and Craig P. Nadel, the plaintiff-appellant, agreed to share equally any royalties received if Nagel marketed the Dual Differential to a toy company. Isaksson alleges that this agreement required royalty-sharing only if Nagel succeeded in marketing the toy. Through 1996, all efforts to market the Dual Differential were unsuccessful.

In late 1996 or early 1997, with Dietmar Nagel having retired, Isaksson and Nadel arrived at a new oral royalty-sharing agreement which both parties agree included the Modified Kenner Car, a newer version of the Dual Differential. The Modified Kenner Car could perform the same spinning and flipping maneuvers as the Dual Differential but had off-road tires, a longer tail that permitted the toy to maintain a straighter path, and a simplified dual-motor propulsion mechanism that

was extracted from a commercially available "Ricochet" car by Kenner. Although the parties concur that this agreement (the "Modified Kenner Car contract") required royalties from the Modified Kenner Car to be split evenly between them, they disagree as to the point in time at which the agreement was made as well as a number of its other terms.

Nadel contends that the Modified Kenner Car contract sprang from his desire to "dust ... off" and "do something with" the Dual Differential and that he and Isaksson agreed to develop further the Dual Differential jointly. (Likely because inventive contributions are circumstantial evidence of whether the Modified Kenner Car contract is such a collaborative development agreement, each party argues at length that he was the true inventor of the improvements to the Dual Differential that led to the Modified Kenner Car.) Depicting himself as a partner in a development agreement, Nadel alleges that the Modified Kenner Car contract entitled him to half of the royalties from any toy resulting from the collaboration regardless of who succeeded in marketing the resulting toy.

Isaksson in turn alleges that the agreement did not arise until after the development of the Modified Kenner Car and that it reflects a new version of the same arrangement that he had made regarding the Dual Differential. Under Isaksson's theory, the agreement was specific to a particular toy, the Modified Kenner Car, and Nadel was a toy marketer who was entitled to half of the royalties only if he successfully marketed the Modified Kenner Car.

With these different understandings of the contract either unrecognized or deemed unimportant, the parties prepared to market the Modified Kenner Car. Nadel commissioned a set of concept drawings in conjunction with his marketing efforts from a design firm called Joe Designer. In the Spring of 1997, he scheduled a meeting to pitch the Modified Kenner Car to Hasbro, a toy company, but the prototype Isaksson had constructed broke while Nadel was preparing for the meeting. Nadel returned the prototype to Isaksson for repairs.

Then came the "fin." In the process of repairing the Modified Kenner Car prototype, Isaksson attached a rigid fin-shaped sheet of plastic extending upward from the midpoint of the axle. This fin, the curved edge of which is called a cam surface, altered the way in which the toy functioned. With the addition of the fin, when the spin of the motor was suddenly reversed and the toy's forward momentum began to flip the toy over, the toy was no longer able to continue in the opposite direction because the fin, unlike the tail, gave the toy discrete top and bottom sides. The toy instead rolled onto and across the cam surface which used the toy's rolling motion to send the toy tumbling up off the ground and into the air. The shape of the cam surface—the fact that the surface or edge became increasingly distant from the axle as the roll of the toy progressed—combined with a little friction to translate some of the toy's horizontal motion into vertical motion. In other words, the toy jumped. For consistency, we adopt the district court's terminology and refer to this finned toy as the "Jumping Toy."

In keeping with his joint-development theory of the Modified Kenner Car contract, Nadel claims that the Joe Designer drawings that he commissioned inspired Isaksson to add the fin and to create the Jumping Toy. In contrast, Isaksson alleges that he dismissed the Joe Designer drawings as they "didn't let the car function at all" and ascribes to himself the status of sole inventor of the Jumping Toy.

Isaksson contacted Nadel soon after conceiving of the Jumping Toy, and the two discussed plans for Nadel to market it to Hasbro. When Nadel announced plans to market it first to a smaller toy company, however, Isaksson, still in possession of the prototype, decided to market the toy directly to Hasbro himself. Isaksson succeeded in pitching and licensing the Jumping Toy to Hasbro, which sold the toy under the name "SkyDriver." The license generated $534,977.26 in royalties.

## 2. The District Court Proceedings

Claiming a right to half of the royalties, Nadel brought this suit in April 1998 in the United States District Court for the Southern District of New York (Richard Owen, J.) on several contract-related theories.[1] He alleged that the Jumping Toy was covered by the Modified Kenner Car contract, that an express oral contract or an implied contract existed directly addressing the Jumping Toy, and that Isaksson was liable in quasi-contract for the benefit Nadel conferred on Isaksson through his efforts to develop and market the Jumping Toy.

The case went to a jury trial in December 1999, and the jury returned a special verdict in favor of Nadel. Question one of the verdict sheet, intended to be dispositive of Nadel's claim under the Modified Kenner Car contract, asked the jury "Is the Jumping Toy ... a 'new' toy? ... If your answer is 'no', proceed no further and return a verdict for plaintiff Nadel, awarding 50% of royalties earned on the Jumping Toy. If your answer is 'yes', proceed to Question 2." During deliberations, the jury requested a definition of a "new" toy and the district court provided the following: "In answer to your question, did the Jumping Car develop from the modified Kenner car, or did it not reasonably develop from

that, but in fact embody a new concept of use and performance? The former is not a new toy and the latter is." The jury then answered question one "no" and never reached the four remaining special interrogatories in questions two through five which addressed Nadel's other contract and quasi-contract claims.

Each party had properly objected to a different aspect of question one, but each objection was overruled. Isaksson objected that the jury charge did not give the jury the opportunity to decide whether the Modified Kenner Car contract was an agreement to share royalties only if Nadel succeeded in marketing the toy, because the charge required the jury to enter a verdict in favor of Nadel if it found that the Jumping Toy was not a "new" toy. Nadel, on the other hand, objected to the definition of a "new" toy given to the jury. He argued that, because the Modified Kenner Car contract was an agreement to develop a toy jointly from the Dual Differential, the correct question was whether the Jumping Car developed from the Modified Kenner Car (and thus from the Dual Differential). Under Nadel's theory, the categorical exclusion from the contract of toys that had "a new concept of use and performance" vis-a-vis the Modified Kenner Car was inappropriate because the Jumping Car could have evolved from the Modified Kenner Car while at the same time possessing "a new concept of use and performance."

Isaksson properly renewed, and the parties briefed, a motion for judgment as a matter of law and, in the alternative, for a new trial. The district court issued a March 29, 2000 Opinion and Order granting judgment as a matter of law in favor of Isaksson, holding that "as a matter of fact and law ... the Jumping Toy is a 'new'

---

1. The complaint also contained a cause of action for unfair competition under New York Law that the district court dismissed on summary judgment. *Nadel v. Isaksson*, No. 98 Civ. 3023(DC), 1999 WL 292619, at *3 (S.D.N.Y. May 10, 1999).

toy," and ordering a new trial on Nadel's remaining contract claims that the jury had not reached.[2] To support its overturning of the jury verdict, the district court stated that it was Isaksson who:

> [W]ent on to conceive of the effect the laws of physics would create by the interconnected addition of the result-achieving fin in a high speed, forward-momentum, sudden stop....
>
> The Jumping Toy was new in that it was capable, all by itself, of vaulting high into the air, which was not contemplated by its predecessors either in the general toy field or in the Nadel/Isaksson relationship. Quite simply, the Dual Differential and the Modified Kenner Car did not vault, and were not expected or intended to vault. Therefore, those capabilities of the Jumping Toy constituted an entirely new concept of use and performance.

In its February 25, 2002 Stipulation and Final Judgment, the district court entered a final judgment, noting that Nadel waived all of his contract arguments other than his claim addressed in question one (that is, his claim under the Modified Kenner Car contract) and entering judgment in favor of Isaksson on interrogatories two through five of the verdict sheet.

## DISCUSSION

On appeal, Nadel argues that we must vacate the district court's judgment as a matter of law because (a) the district court impermissibly used the "seriously erroneous" standard intended for granting a new trial under Fed.R.Civ.P. 59 to grant judgment as a matter of law under Fed. R.Civ.P. 50(b), and (b) there was legally sufficient evidence to support the jury's finding that the Jumping Toy was not a "new" toy even under the proper and stricter Rule 50(b) standard. We address only Nadel's second argument, and we agree that Nadel did present sufficient evidence to support the jury's finding. Because we conclude that the jury's finding that the Jumping Toy is not a "new" toy vis-a-vis the Modified Kenner Car is not dispositive of Nadel's claim to royalties under the Modified Kenner Car contract, however, we remand for further fact-finding.

### 1. Legally Sufficient Evidence to Support the Jury's Finding That the Jumping Toy Is Not a "New" Toy

Rule 50 enables the district court to enter judgment as a matter of law

---

2. That the district court ordered judgment as a matter of law on question one and that the new trial was limited to questions two through five of the verdict sheet were not immediately apparent from the March 29, 2000 Opinion and Order. In an appeal of this Opinion prior to and distinct from the current appeal, Nadel argued that the district court lacked jurisdiction to enter the order because it improperly used the "seriously erroneous" standard of review to grant judgment as a matter of law on question one. After dismissing the appeal as an impermissible interlocutory appeal in a July 31, 2000 Summary Order and granting a motion for reconsideration on October 16, 2000, this Court held in a May 8, 2001 Summary Order that it lacked jurisdiction to consider an interlocutory appeal "[w]hether or not the ruling Nadel challenges was correctly decided." The May 8, 2001 Summary Order also noted "that the district court's opinion is somewhat confusing" because the district court's language suggested at different points that it both did and did not grant judgment as a matter of law that the Jumping Toy was a "new" toy, and stated "[w]e think the district court should clarify its decision." In the course of a telephone conference with the parties on December 3, 2001 and in its Stipulation and Final Judgment of February 25, 2002, the district court clarified that it had issued judgment as a matter of law that the Jumping Toy was a "new" toy and established that the new trial was limited to the other issues not reached by the jury.

against a party on an issue only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue," Fed.R.Civ.P. 50(a), and permits the district court to do so after a jury verdict, provided a pre-verdict motion is properly renewed, Fed.R.Civ.P. 50(b). The standard for post-verdict judgment as a matter of law is the same as for summary judgment under Fed.R.Civ.P. 56, *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir.1998), and thus "[a] district court must deny a motion for judgment as a matter of law unless, viewed in the light most favorable to the nonmoving party, 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'" *Cruz v. Local Union No. Three of the Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1154–55 (2d Cir. 1994) (quoting *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970)) (second alteration in original). We review the district court grant of judgment as a matter of law *de novo*. *This Is Me, Inc.*, 157 F.3d at 142.

▆ We hold that Nadel presented sufficient evidence for a reasonable jury to have answered question one of the verdict sheet in his favor. First, we note that the meaning of the term "new" toy in question as described by the district court's clarification of the term provided two definitions that were not necessarily mutually exclusive. The district court's instructions defined the circumstances under which the Jumping Toy was not a "new" toy as "the Jumping Car develop[ing] from the modified Kenner car," while they also described the circumstances under which the Jumping Toy was a "new" toy as the Jumping Car "embody[ing] a new concept of use and performance." It is, however, theoretically possible for the Jumping Car both to

have "develop[ed] from" the Modified Kenner Car and to have embodied a new concept of use and performance. To parse these instructions, the jury could permissibly have read the phrase "a new concept of use and performance" to be merely that which did not "develop from the modified Kenner car." Given the undisputed testimony that Isaksson created the Jumping Toy by adding a fin to the Modified Kenner Car prototype, a reasonable person could conclude that the Jumping Car developed from the Modified Kenner Car and that the Jumping Toy was therefore not a "new" toy. At trial, Isaksson noted the definition of a "new" toy provided by the district court "sounds like something we could live with" and thus waived any argument that this definition did not reflect his theory of the scope of developments or improvements to the Modified Kenner Car that were included in the oral contract.

Second, even focusing on the "new concept of use and performance" prong of the definition of a "new" toy, as the district court did in its March 29, 2000 Opinion granting judgment as a matter of law, we hold that a reasonable jury could have found that the Jumping Toy was not a "new" toy vis-a-vis the Modified Kenner Car based on the videotapes of each toy viewed by the jury. The district court is certainly correct that the Jumping Toy was able to vault and that the Modified Kenner Car was not. The question, however, was not whether the Jumping Toy had *any* new functional qualities but rather whether new functional qualities constituted a sufficient alteration to render the Jumping Toy "new" in the sense of no longer being covered by the scope of the Modified Kenner Car contract. There is no single answer to the question which functional qualities define a toy under the parties' rather imprecise contract, making the question whether one toy is "new" vis-

a-vis another a quintessential question for a jury, provided the toys share some substantial qualities as the Jumping Toy and the Modified Kenner Car indisputably do. For example, the district court itself stated in its March 29, 2000 Opinion that the vaulting capacity was the result of an "interconnect[ion]" between the fin and a "a high speed, forward-momentum, sudden stop" that used inertia to flip the body of the toy over the axle. This latter aspect of the Jumping Toy's function is in itself a "concept of use and performance," and it is not new: it derives directly from both the Dual Differential and the Modified Kenner Car. The visual evidence viewed by the jury permits an inference that both of these earlier toys were designed, like the Jumping Toy, specifically to permit the body and tail of the vehicle to roll or flip over the axle. We therefore hold that the Modified Kenner Car and the Jumping Toy shared sufficient "concept[s] of use and performance" for a jury reasonably to conclude that the Jumping Toy was not "new."

### 2. Whether the Jumping Toy Is a "New" Toy Is Not Dispositive of Nadel's Claim to Royalties Under the Modified Kenner Car Contract

■ The district court structured question one of the verdict sheet to be dispositive of Nadel's claims under the Modified Kenner Car contract; the jury was instructed to enter a verdict in favor of Nadel if it answered "no." Because we conclude that the jury's answer in favor of Nadel on question one resolves only one of the issues necessary to determine whether Nadel is entitled to royalties earned from the Jumping Toy, and because Isaksson properly objected before the charge was given to the jury, we remand to the district court for further fact-finding.

■ By querying whether the Jumping Toy was "new," question one asked the jury to determine whether the Jumping Toy was within the scope of the Modified Kenner Car contract and its royalty-sharing provision. Because the contract is an agreement between private individuals, the parties could have defined the set of yet-to-be-developed toys covered by the agreement largely how they pleased.[3] In fact, as discussed above, the parties did have a factual dispute over how they chose to define the scope of the agreement: Nadel argued that the agreement applied to any toy jointly developed from the Dual Differential; Isaksson argued that the agreement was made on the basis of a specific toy. Because Isaksson did not object to the definition of a "new" toy provided to the jury (that is, Isaksson did not object to the jury instructions on the extent of the toy designs encompassed by the agreement) and because Nadel is not unhappy with the jury's resolution of the scope issue in his favor, however, this Court accepts that question one and the definition of a "new" toy properly defined the scope

---

**3.** In his motion for judgment as a matter of law, Isaksson implies that the Jumping Toy must be a "new" toy because he received a patent on it, but this argument confuses a "new" toy in patent law, which is measured in relation to prior art in the field, *see* 35 U.S.C. § 102(a) (establishing the requirement of novelty for a patentable invention), and what constitutes a "new" toy as defined by the parties to the Modified Kenner Car contract, which is measured only in relation to the Modified Kenner Car. Section 102 novelty does not necessarily control the scope of the Modified Kenner Car contract as parties may have agreed to share royalties from a toy and any patentable or unpatentable improvements thereon. Furthermore, although the district court's definition of a "new" toy did define the scope of the Modified Kenner Car contract based on whether the concept behind the Jumping Toy's use or performance was "new," the parties need not have employed the use, performance or function of the toy at all to determine the scope of their contract.

of the contract for the jury. The jury's answer to question one in Nadel's favor must therefore be reinstated as the definitive resolution of the parties' disagreement over whether the Jumping Toy falls within the scope of toys the parties intended to include in the Modified Kenner Car contract.

The reinstatement of the jury finding, however, does not resolve the entire Modified Kenner Car contract claim. While Nadel is entitled to maintain the jury's fact-finding on the issue of whether the Jumping Toy was within the scope of the agreement, the performance that Nadel was required to render to receive his fifty percent share of the royalties was disputed in the district court and remains uncertain. Although the record contains some ambiguity, Isaksson did argue and present evidence in the district court to support his theory that the agreement entitled Nadel to fifty percent of the royalties only if he successfully marketed the toy. The jury, however, was never given the opportunity to determine the nature of the performance term in the Modified Kenner Car contract; the verdict sheet did not permit the jury to make a finding whether Nadel's share of the royalties was contingent upon his successful marketing of the toy. Rather than reinstating judgment in favor of Nadel, we therefore remand for a new trial limited to the issues of what performance the agreement required of Nadel for him to earn a share of the royalties and whether Nadel fulfilled those performance obligations.

### CONCLUSION

For the reasons stated above, we vacate the district court's grant of judgment as a matter of law in favor of Isaksson, we reinstate the jury finding on the issue of whether the Jumping Toy was a "new" toy in favor of Nadel, and we remand for a new trial limited to the issues of (1) what performance the Modified Kenner Car agreement required of Nadel for him to earn a share of the royalties, and (2) whether Nadel fulfilled those performance obligations.