PEDINOL PHARMACAL,
INC., Plaintiff,

v.

RISING PHARMACEUTICALS,
INC., Defendant.

No. CV 06–2120.

United States District Court,
E.D. New York.

Aug. 5, 2008.

Leeds Morelli & Brown, by Rick Os-
trove, Esq., Carle Place, NY, Moritt Hock

**500**

Hamroff & Horowitz LLP, by Michael S. Re, Esq., Garden City, NY, Hanor & Guerra, by Charles W. Hanor, San Antonio, TX, for Plaintiff.

Ruskin Moscou Faltischek, P.C., by Mark S. Mulholland, Esq., Uniondale, NY, McDermott Will & Emory, LLP, by Theodore R. Stephens, Esq., Washington, DC, The Lustigman Firm, P.C., by Andrew B. Lustigman, Esq., New York, NY, Bracken, Margolin & Gouvis, LLP, by Linda U. Margolin, Esq., Islandia, NY, for Defendant, Rising Pharmaceuticals.

Troutman Sanders LLP, by Barry J. Brett, Esq., New York, NY, for Defendant Gold.

## MEMORANDUM AND ORDER ON RULE 50 MOTIONS DAMAGES AND INJUNCTIVE RELIEF

WEXLER, District Judge.

This is a Lanham Act false advertising case that was tried before a jury. The jury heard the Lanham Act claim of Plaintiff Pedinol Pharmacal, Inc. ("Pedinol") against Defendant Rising Pharmaceuticals, Inc. ("Rising") as well as the Lanham Act claim of Rising against Pedinol.[1] The jury found that both sides engaged in false advertising. As noted in previous opinions of this court, the jury decided the damages claim against Rising, awarding only nominal damages in the amount of $1. Pursuant to a stipulation of the parties agreed upon prior to trial, the damages claim of Rising against Pedinol was reserved for the court to decide.

Presently before the court are the parties' motions pursuant to Rule 50(a) of the Federal Rules of Civil Procedure as well as the damages claim of Rising, and both parties' requests for injunctive relief.

---

1. A claim brought by Pedinol against individual Defendant Ronald Gold was dismissed

## DISCUSSION

### I. *Rule 50 Motions*

#### A. *Legal Principles*

Rule 50(a) of the Federal Rules of Civil Procedure allows a court to set aside a jury's finding if the court finds that "a reasonable jury would not have a legally sufficient evidentiary basis" to find as it did. Fed.R.Civ.P. 50(a). In such a case the court may resolve the issue against the party in whose favor the jury found, and grant a motion for judgment as a matter of law to the moving party. Fed.R.Civ.P. 50(a)(1)(A)(B). *Cobb v. Pozzi,* 363 F.3d 89, 101 (2d Cir.2003).

◼ The standard governing Rule 50 motions is well established. Such motions may not be granted unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find as it did. *See, e.g, Sir Speedy, Inc. v. L & P Graphics, Inc.,* 957 F.2d 1033, 1039 (2d Cir.1992); *Vasbinder v. Ambach,* 926 F.2d 1333, 1339 (2d Cir.1991). In deciding a Rule 50 motion, the court must give deference to all credibility determinations and reasonable inferences of the jury. *Vasbinder,* 926 F.2d at 1340. Judgment as a matter of law should not be granted unless: "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Cruz v. Local Union No. 3,* 34 F.3d 1148, 1154 (2d Cir.1994) (quoting *Bauer v. Raymark Industries,*

before submission of the case to the jury.

*Inc.,* 849 F.2d 790, 792 (2d Cir.1988)) (internal quotation marks omitted). A district court must deny a motion for judgment as a matter of law unless, viewed in the light most favorable to the nonmoving party, "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *Nadel v. Isaksson,* 321 F.3d 266, 271–72 (2d Cir.2003)(*quoting Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir.1970)); *see Weingarten v. Optima Communications Systs., Inc.,* 2008 WL 586280 *3 (S.D.N.Y.2008).

The standard for a motion for judgment as a matter of law is the same as for summary judgment under Rule 56 of the Federal Rules. *Nadel,* 321 F.3d at 272. Accordingly, a Rule 50 motion for judgment as a matter of law must be denied unless, viewed in the light most favorable to the nonmoving party, "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *Cruz,* 34 F.3d at 1154–55.

### B. *Disposition of Rule 50 Motions*

As the foregoing standard makes clear, the burden on a party seeking to set aside a jury verdict is extremely high. Upon review of the trial, and the submissions of the parties, the court holds that neither party is entitled to have the jury verdict set aside. There was ample factual and expert testimony presented to the jury. It was for the jury, and not the court, to weigh the evidence admitted, and that is exactly what occurred. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

This case was highly contested and well tried by all counsel. Indeed, the court is hard pressed to recall a trial in which the claims of the parties was so competently and clearly presented by counsel to a jury. The jury was presented with compelling factual and capable expert evidence by both sides. Under the circumstances here, the court holds that because it cannot be said that no reasonable jury could have found as did the jury in this case, there is no basis for setting aside the verdict. Accordingly, the motions pursuant to Rule 50 are both denied.

### II. *Rising's Damages Claim*

### A. *Legal Principles*

The claim upon which Rising prevailed alleged false advertising pursuant to Section 43(a) of the Lanham Act. *See* 15 U.S.C. § 1125(a) ("Section 1125(a)"). A plaintiff that proves a violation of Section 1125(a) is entitled "subject to the provisions of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a) ("Section 1117(a)"). Rising seeks an award based upon Pedinol's profits.

Section 1117(a) instructs the court as to the burdens of proof with respect to the assessment of profits. It is the plaintiff's burden to prove defendant's sales, and defendant's burden to prove deductible costs and expenses. 15 U.S.C. § 1117(a). In the event that the court finds that recovery based upon profits is "either inadequate or excessive," the court has discretion to enter judgment in an amount found to be just, according to the circumstances of the case. 15 U.S.C. § 1117(a). Ultimately, recovery for a violation of the Lanham Act "shall constitute compensation and not a penalty." 15 U.S.C. § 1117(a).

■ The possible recoveries set forth in Section 1117(a) apply to the violation of Sections 1125(a)(c) and (d) of the Lanham Act. It is only with respect to Section 1125(c), claims for trademark dilution, (which are not at issue here), that the element of wilfulness is mentioned. Specifically, Section 1117(a), as amended in 1999, states that "a violation of Section 1125(a) or(d) ... or a *wilful* violation under section 1125(c)" (emphasis added) entitles the prevailing party to the recovery set forth above. It is thus clear that in a case of trademark dilution in violation of Section 1125(c), a showing of wilfulness is a prerequisite to recovery of lost profits. There is no similar language referring to wilfulness with reference to a violation of Sections 1125(a) or 1125(d) of the Lanham Act.

The express use of the term "wilful" with respect to a violation of Section 1125(c), but not with respect to Sections 1125(a) or (d), supports a plain language interpretation of Section 1117 that requires no showing of wilfulness prior to granting defendant's profits for a violation of the latter two sections. This interpretation is, however, at odds with Second Circuit precedent decided prior to the 1999 amendment to Section 1117(a). Specifically, prior to 1999, it was clearly the law in this circuit that a finding of wilfulness was required to recover lost profits for a violation of Section 1125(a).

The seminal case in the Second Circuit setting forth the wilfulness requirement is *George Basch Co., Inc. v. Blue Coral Inc.*, 968 F.2d 1532 (2d Cir.1992).[2] That case held that "a finding of defendant's wilful deceptiveness is a prerequisite for awarding profits." *Basch*, 968 F.2d at 1537. It was thus clear, prior to the amendment of

Section 1117(a), that a showing of wilfulness was required to establish an entitlement to lost profits for a violation of Section 1125(a).

The continuing viability of the wilfulness requirement set forth in *Basch*, decided prior to the amendment of Section 1117(a), is an open question. Courts interpreting Section 1117(a) since the amendment have reached different conclusions as to whether the *Basch* requirement of wilfulness remains. *Compare Malletier v. Dooney & Bourke, Inc.*, 500 F.Supp.2d 276, 280–81 (S.D.N.Y.2007) (wilfulness remains a requirement for recovery of damages and profits for violation of Section 1125(a)) *and Life Services Supplements, Inc. v. Natural Organics, Inc.*, 2007 WL 4437168 *5–6 (S.D.N.Y.2007) (same) *with Cartier v. Aaron Faber, Inc.*, 512 F.Supp.2d 165, 173 (S.D.N.Y.2007) (wilfulness no longer required after 1999 amendment) *and Nike, Inc. v. Top Brand Co.*, 2005 WL 1654859 *35–36 (S.D.N.Y.2005) (same); *see also Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Management, Inc.*, 2007 WL 74304 *12 n. 17 (E.D.N.Y.2007) (noting, but not deciding, question of viability of *Basch* ).

■ This court finds more convincing those cases holding that wilfulness remains a requirement for the recovery of a defendant's profits under Section 1117. First, and most importantly, when Section 1117 was amended to provide for recovery of a defendant's profits for a wilful violation under Section 1125(c), no changes were made regarding the recovery provisions of Section 1125(a) or (d). The 1999 amendment addressed, and added only the recovery available where a plaintiff proves a violation of Section 1125(c). As to the

---

**2.** *Basch* involved a trade dress violation and not, as here, a false advertising violation. Recovery for a violation of either of these provi-

sions of Section 1125(a) of Lanham Act are, however both addressed under Section 1117(a).

statute's provisions for recovery under Sections 1125(a) and (d), no change was made. There is no reason to believe that Congress intended to change existing law with respect to Sections 1125(a) or (d). *Accord Malletier,* 500 F.Supp.2d at 281: *Life Services Supplements, Inc.,* 2007 WL 4437168 *4; *Mastercard Internat'l. v. First Nat'l. Bank of Omaha, Inc.,* 2004 WL 326708 *11 (S.D.N.Y.2004). The court holds, therefore, that the Second Circuit's interpretation of Section 1117(a) in Basch, which construed the same statutory language that existed prior to the 1999 amendment of the statute, remains good law. *See, e.g., Imig, Inc. v. Electrolux Home Care Prods., Ltd.,* 2008 WL 905898 *19–20 (E.D.N.Y.2008) (noting requirement of finding wilfulness prior to award of defendant's profits); *Merchant Media, LLC v. H.S.M. Internat'l.,* 2006 WL 3479022 *11 (S.D.N.Y.2006); *Pfizer, Inc. v. Y2K Shipping & Trading, Inc.,* 2004 WL 896952 *9 (S.D.N.Y.2004).

## B. *Evidence of Wilfulness*

Since the court has determined that wilfulness is a prerequisite to recovery of Pedinol's profits, the court considers whether there was such a showing in this case. As demonstrated below, there was ample evidence of wilfulness and intentional deception demonstrated at trial.

This case involved the sale and marketing of Pedinol's name brand "Lactinol" 10% lactic acid product, in competition with Rising's non-name brand lactic acid product. Not surprisingly, Rising's product sold for a fraction of the price of the Pedinol product. When faced with this competition, Pedinol embarked upon a campaign, lasting several years, aimed at destroying the ability of Rising to compete with Pedinol's Lactinol.

To achieve its objective, and as part of its aptly named "Sinking Rising" campaign, Pedinol sent a series of false and deceptive letters to Rising's customers. Despite the clear knowledge of Pedinol's management that Lactinol was not a "single source" product, as that term is known in the relevant regulatory marketplace, Pedinol sent thousands of letters falsely stating that Lactinol was "single source" and that no generic product could be substituted by the pharmacist.[3] These letters were sent to small neighborhood pharmacists and to large chain stores alike.

▮ Not only were these letters false in their statements as to the "single source" nature of Lactinol, they were threatening. Recipients of letters sent pursuant to Pedinol's false letter writing campaign were advised that substitution of Lactinol products for a non-name brand product *"violates laws* that govern the substitution of prescription pharmaceuticals." (emphasis in original). Recipients were further informed that there is *no legally* appropriate substitute for Lactinol products. Finally, pharmacists receiving false letters from Pedinol were advised that the failure to stop substituting a 10% lactic acid product for Lactinol would lead to "corrective action such as notifying the Office of Professional Discipline [and] New York State Medicaid...." The evidence at trial established that such threats were empty, and the likelihood of professional repercussions following substitution of 10% lactic acid for Lactinol was either remote or nonexistent. It is not a leap of faith, however, to con-

**3.** It was established at trial that a "single source" product is one that has been issued a New Drug Application ("NDA") by the FDA. While it was, and remains, legal to market Lactinol, as well as 10% lactic acid products, there is no question but that Lactinol was never granted the NDA status that would allow Pedinol to claim single source status for its product.

clude that Pedinol's threats would lead to a pharmacist's decision to stop dispensing Rising's 10% lactic acid product for fear of jeopardizing a professional license or being charged with Medicaid fraud. When considering the nature of the statements made, and the knowledge of those disseminating such statements, the court holds that Rising has established the wilfulness necessary to support its claim for Pedinol's profits as an appropriate measure of recovery pursuant to Section 1117(a).

C. *Factors to Consider When Determining Entitlement and Amount of Lost Profits*

■ The court turns now to consider the impact of several factors that bear upon this court's exercise of its equity jurisdiction. Equitable principles applicable to the Lanham Act hold that a plaintiff is not automatically entitled to all of defendant's profits over the time period of the false statements. Indeed, in *Basch,* the Second Circuit recognized the "conceivably draconian impact that a profits remedy may have in some cases." *Basch,* 968 F.2d at 1540. The Second Circuit went on to explain that "[w]hile damages directly measure the plaintiff's loss, *defendant's* profits measure the defendant's gain. Thus, an accounting may overcompensate for a plaintiff's actual injury and create a windfall judgment at the defendant's expense." *Id.* (emphasis in original) Factors to consider to ensure equity include: (1) the degree of certainty that the defendant benefitted from the unlawful conduct; (2) availability and adequacy of other remedies; (3) the role of a particular defendant in effectuating the wrongful conduct; (4) plaintiff's laches; and (5) plaintiff's unclean hands. *Gidatex, S.r.L. v. Campaniello Imports, Ltd.,* 82 F.Supp.2d 136, 142 (S.D.N.Y.2000). The court exercises its discretion as to the proper weight to be given these factors under the circumstances. *Id.*

An award of defendant's profits is justified by three possible rationales: "(1) the defendant is unjustly enriched; (2) the plaintiff sustained damages from the [defendant's false statements]; or (3) the award of profits is necessary to deter a wilful [wrongdoer] from doing so again." *Basch,* 968 F.2d at 1537. The unjust enrichment rationale depends upon a showing that if it were not for the defendant's wrongful conduct, its sales would have gone to plaintiff. *Basch,* 968 F.2d at 1538.

■ The court agrees with Rising that Pedinol was unjustly enriched by its false statements. Evidence produced at trial showed the success of Pedinol's false letter writing campaign. Specifically, a Pedinol internal memo, dated May 29, 2003, lists twenty-one large retailers that were no longer substituting Lactinol for non-name brand products. Five retailers were noted to be continuing substitution. It was noted, however, that one of those retailers, CVS, was only substituting one product, and that substitution was a result of a "glitch" in the CVS computer system.

As to CVS, the court also notes that Pedinol's false statements were demonstrated to be directly responsible for Rising's inability to sell its product to the CVS chain of stores. Ronald Gold, Rising's president, ("Gold") testified credibly that Dave Marshall (a CVS buyer, who received Pedinol's letter, and was visited by Pedinol management), refused to sell Rising's product. According to Gold, the refusal to carry Rising's product led to a loss of $400,000 in sales to CVS, which kept Rising's product off the store's shelves until Marshall left CVS. Gold's testimony regarding Dave Marshall also supports the conclusion that Rising suffered damage to its reputation as a result of Pedinol's false statements.

Of the remaining factors for the court to consider: (1) availability of other remedies; (2), the role of a particular defendant in the wrongful conduct; (3) plaintiff's laches; and (4) plaintiff's unclean hands, the third factor, laches, has no application here. As to the availability of other remedies, with the exception of the testimony regarding CVS, it is difficult to value the damage suffered by Rising to its product line and reputation. Regarding the role of a particular defendant in effectuating the wrongful conduct, it is clear that the decision makers for Pedinol were well aware of the false statements and directly responsible for orchestrating the campaign that injured Rising.

 Unclean hands is argued by both sides. Rising claims that Pedinol's unclean hands should enhance the profit award, while Pedinol argues that Rising's unclean hands bars a recovery of profits. The burden of proving that unclean hands bars equitable relief is on the party asserting the defense. *See Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F.Supp.2d 136, 139 (S.D.N.Y.2000). That burden is satisfied by a showing of "truly unconscionable and brazen behavior." *Freedom Calls Foundation v. Bukstel*, 2006 WL 845509 *23 (E.D.N.Y.2006) (same); *Apollo Theater Foundation, Inc. v. Western Intern. Syndication*, 2005 WL 1041141 *16 (S.D.N.Y.2005) (unclean hands bars relief where party seeking equity has engaged in "some unconscionable act"). Where there is wrongdoing by both parties, the court may properly weigh the magnitude of the parties' conduct against each other. *Dunlop-McCullen v. Local 1-S, AFL-CIO-CLC*, 149 F.3d 85, 92–93 (2d Cir.1998).

Pedinol's unclean hands argument relies on the finding of liability against Rising on Pedinol's Lanham Act claim. The court holds that the verdict against Rising is insufficient to support a finding of unclean hands. Even the jury that found against Rising was unimpressed with the magnitude of its behavior, deciding to award Pedinol only nominal damages of $1. While this may reflect the jury's decision as to the ability of Pedinol to show any monetary damage, it also demonstrates that even after considering "any other factor" bearing on damages, as instructed by the court, the jury was not moved to award anything to Pedinol as a result of Rising's Lanham Act violation.

What matters ultimately as to the unclean hands issue is this court's conclusion as to Rising's behavior. On that issue, the court cannot find any conduct rising to the level of unclean hands that would bar recovery for lost profits. At worst, Rising was liable for wrongly stating that the brand name of its product was Lactinol and this may have led to some confusion on the part of buyers. This behavior, however, pales in comparison to that of Pedinol which, as demonstrated above, disseminated a barrage of false letters aimed at destroying Rising's ability to compete with Pedinol. Under these circumstances, the court holds that unclean hands, standing alone, neither bars nor diminishes Rising's claim for lost profits.

### D. *Profit Award*

The court has concluded that Rising has established its right to Pedinol's profit as a measure of its recovery under the Lanham Act. The time period for calculating that profit is the period during which the false statements were disseminated—from April of 2003 through 2006. In accord with Section 1117(a), it is Rising's burden to show Pedinol's profit and Pedinol's burden to show expenses offsetting that profit.

Not surprisingly, the parties set forth different numbers as to the profitability of Pedinol's Lactinol. Rising seeks a total of $3,018,671, representing what it claims to

be the profitability of Lactinol over the relevant time period. Also sought is interest in the amount of $374,286. Rising further asks the court to treble the award due to the wilfulness and duration of the false letter writing campaign. Pedinol, on the other hand has a much more conservative view of the profitability of its product. Specifically, Pedinol calculates its profits over the same relevant time period as amounting to $774,448.00.

The vast discrepancy in the parties' calculations is explained by their different approaches. Rising calculates Pedinol's profits based upon the model introduced by Pedinol at trial. At that stage of the proceedings, Pedinol was in the position of seeking Rising's profits, instead of defending against a claim that its own profits be disgorged. At trial, Pedinol sought profits in excess of $11 million. This figure was based upon the assumption that all sales made by Rising would have been made by Pedinol, at the prices set by Pedinol.

Rising's present claim does not claim as high a profit margin as that claimed by Pedinol at trial, but seeks what it describes as a more conservative profit margin of 33%. Rising sets forth Pedinol's total revenues of products at issue during the relevant time period (from documents introduced by Pedinol at trial) as follows:

| | |
|---|---|
| 4–12/2003: | $2,552,540 |
| 2004: | $1,997,427 |
| 2005: | $2,094,064 |
| 2006: | $1,114,088 |

Deduction of selling expenses and general and administrative expenses, according to Rising, as deduced from documents introduced at trial, yields profits of $589,459 for the relevant portion of 2003, and profits of $644,687, $1,154,504 and $630,021 for the years 2004, 2005 and 2006. The total profit sought by Rising is thus $3,018,671. Additionally, Rising seeks interest, at the prevailing prime rate of interest in the amount of $374,286, for a total recovery of $3,392,957.

Rising's profit claim of over $3 million is contrasted with Pedinol's profit calculation, over the same time period, of $774,448. Pedinol's accounting expert relies on documents demonstrating that Rising's revenue figures are inflated because they reflect gross sales only, without taking into account discounts, chargebacks and rebates. These factors, according to Pedinol, reduce its sales by over $595,000. Additionally, Pedinol asserts that selling costs associated with the marketing of Lactinol, a highly promoted product, are higher than those assumed by Rising. Pedinol also claims that 2005 and 2006 promotional expenses, not taken into account by Rising, decreased Lactinol's profitability. Finally, Pedinol asserts that Rising has failed to take into account costs of sampling, warehousing and shipping, and has incorrectly calculated general and administrative expenses.

While Rising's profit calculation is certainly less that the $11 million dollar award sought by Pedinol at trial, it is substantially higher than the $774,448 claimed by Pedinol as the proper profit at this stage of the proceedings. As illustrated by Rising, when Pedinol sought profits it claimed a profit rate of 66%, Rising seeks a profit rate of approximately 33%, and Pedinol now claims profitability at the rate of approximately 8.5%. At least part of this difference must be attributed to the fact that Pedinol's trial request for damages sought Rising's profits and Rising now seeks Pedinol's actual profit based upon its sales of Lactinol.

With the focus properly set on Pedinol's actual profits, and not its claim for Rising's profits, the court holds that Rising has made a reasonable showing of profits based upon the limited documents available at trial. Pedinol has, according to its

burden under Section 1117(a), come forward with appropriate documentation showing the expenses that should be deducted to arrive at its profit figure. While it is true that Pedinol did not put forward all of these expenses at trial, it was not under an obligation to do so at that time. Indeed, Rising did not decide to pursue a claim for lost profits until the eve of trial. Upon allowing Rising to pursue that measure of damages, the court contemplated the exchange of further information regarding expenses in post-trial submissions. Those submissions have been exchanged and reviewed by the court.

In addition to considering the numbers set forth by the parties, the court must also consider the equities. While Rising is entitled to a profit award, it would be inequitable for the court to assume that Pedinol was unjustly enriched as to each and every sale of Lactinol made during the relevant time period. To award Rising the full profit of all Lactinol sales would, in the court's view, result in a windfall, an outcome not contemplated by the Lanham Act. As noted, recovery under the Lanham Act should constitute "compensation and not a penalty." 15 U.S.C. § 1117(a). The court must not "create a windfall judgment at the defendant's expense." *Basch,* 968 F.2d at 1540.

Taking into account the parties' submissions, and principles of equity, the court holds that a lost profit award to Rising in the amount of $774,448 is an appropriate measure of recovery for Pedinol's wilful Lanham Act violation.

## III. *The Parties' Requests for Injunctive Relief*

### A. *Legal Principles*

The Lanham Act provides for the issuance of injunctive relief, "according to the principles of equity and upon such terms as the court may deem reasonable to prevent the violation of … [the Lanham Act]" 15 U.S.C. § 1116. An injunction will be ordered where a party has succeeded on the merits, there is an absence of an adequate remedy at law, and an injunction is necessary to prevent irreparable harm. *Roach v. Morse,* 440 F.3d 53, 56 (2d Cir.2006).

The historic purpose of an injunction is to ensure that past wrongdoing is not repeated, not to further punish the wrongdoer. *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 61, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). Accordingly, an injunction is unnecessary if there is no reasonable likelihood that the conduct at issue will be repeated. *See SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100 (2d Cir. 1972); *Imig, Inc.,* 2008 WL 905898 *19 (E.D.N.Y.2008); *L. & J.G. Stickley, Inc. v. Cosser,* 2008 WL 305102 *3 (N.D.N.Y. 2008).

### B. *Pedinol's Request for Injunctive Relief*

Pedinol seeks to have the court issue an injunction preventing Rising from stating that its products are generic drugs, therapeutic alternatives, the pharmaceutical equivalent, of, or "bioequivalent" of Lactinol. Pedinol further seeks to prevent Rising from stating that its product contains 10% lactic acid or engaging in advertising stating that the Rising product can be compared to Lactinol. Pedinol also requests an order requiring Rising to engage in corrective advertising with respect to each of these terms and statements.

The court declines to order any of the injunctive relief sought by Pedinol. First, the court holds that Pedinol's unclean hands, characterized by the company's wilful misstatements regarding its product, and aimed directly at destroying

the ability of Rising to compete, bar the relief sought.

More importantly, however, the court holds that the evidence adduced at trial does not support the broad relief sought. There was insufficient expert evidence to support Pedinol's claim that Rising's product does not contain 10% lactic acid. Nor did the evidence support the broad request regarding the ambiguous terms "therapeutic equivalent," "pharmaceutical equivalent" or "bioequivalence" and whether these terms dictate how a particular audience might interpret the term "generic." The court also denies to order the relief sought on the ground that it is overly broad and non-specific, and would therefore result in difficulties with both compliance and monitoring by the court. *See Imig, Inc.*, 2008 WL 905898 *18 (declining to enter injunction against all future "untruthful" advertising claims because "such prior restraint on advertising seems neither necessary nor equitable. . . .").

Additionally, the court declines to enter any order preventing Rising from engaging in non-misleading comparative advertising. Such advertising is entirely acceptable. *See Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F.Supp.2d 410, 423 (S.D.N.Y.2002) (comparative advertising serves the "beneficial purpose of imparting factual information about the relative merits of competing products") (quoting *Deere & Co. v. MTD Prods.*, 41 F.3d 39, 44 (2d Cir.1994)); *see, e.g., Toni & Guy (USA) Ltd. v. Nature's Therapy, Inc.*, 2006 WL 1153354 *6 (S.D.N.Y.2006); *Pfizer, Inc. v. Perrigo*, 988 F.Supp. 686, 700 (S.D.N.Y.1997).

Finally, to the extent that Rising made any misstatement regarding the relation between Rising and Lactinol and FDA approval, such statements have been discontinued and there is no likelihood that Rising will make any misstatements regarding its relation to Lactinol in the future.

### C. *Rising's Request for Injunctive Relief*

Rising seeks to have the court enter an injunction preventing Pedinol from stating that Lactinol is a single source product covered under the Drug Efficacy Safety Initiative ("DESI"), or that Lactinol is otherwise an FDA approved drug. Rising further seeks to prevent Pedinol from stating that dispensing Rising's 10% lactic acid product violates state or federal laws or that Rising's product is not reimbursable by state Medicaid pharmacy programs. While the court agrees that there was sufficient evidence at trial to support the finding that Pedinol made several false statements regarding Rising, the court holds that the evidence also demonstrated that these statements were discontinued. There is no reason to believe that Pedinol will make such misstatements in the future. Because Rising has been compensated by an award of Pedinol's lost profits and there is no reasonable likelihood that Pedinol's conduct will be repeated, the court declines to enter the injunction sought by Rising.

### CONCLUSION

The court denies both parties' motions pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. Rising is awarded lost profits under Section 1117(a) of the Lanham Act in the amount of $774,448. Both parties' motions for injunctive relief are denied. Rising is directed to submit an appropriate judgment, on notice, to the court. The Clerk of the Court is directed to terminate all outstanding motions and to close the file in this case.

SO ORDERED.